# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-4082WM, 00-4083WM, 01-1136WM

_____

_____

No. 00-4082WM

_____

United States of America,

       Appellee,

v.

Arboleda A. Ortiz,

       Appellant.

_____

No. 00-4083WM

_____

United States of America,

       Appellee,

v.

German Sinisterra,

       Appellant.

On Appeal from the United
States District Court
for the Western District
of Missouri.

_____

No. 01-1136WM

_____

United States of America,

        Appellee,

v.

Plutarco Tello,

        Appellant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*

_____

Submitted:  June 10, 2002

Filed:  November 5, 2002

_____

Before WOLLMAN, RICHARD S. ARNOLD, and LOKEN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Arboleda A. Ortiz, German C. Sinisterra, and Plutarco Tello appeal their convictions and death sentences (in the cases of Mr. Ortiz and Mr. Sinisterra) and life sentence (in the case of Mr. Tello) for murder, drug trafficking, and traveling in interstate commerce with the intent to commit a murder for hire.  Appellants argue that the trial court did not exclude or suppress inadmissible evidence, including confessions that were involuntary and obtained in violation of <u>Miranda</u> and Article 36 of the Vienna Convention on Consular Relations, did not conduct adequate voir dire, violated defendants' Sixth and Eighth Amendment rights, improperly instructed the jury at the sentencing phase of the trial, and should have declared a mistrial sua

sponte in response to remarks made in the government's closing arguments. We affirm. In particular, we hold that defendants have shown no prejudice to their case resulting from violations of the Vienna Convention, and therefore are entitled to no relief on the basis of those violations.

Defendants Arboleda A. Ortiz, German C. Sinisterra, and Plutarco Tello were found guilty of (1) conspiracy to distribute cocaine, a Schedule II controlled substance, in an amount of five kilograms or more; (2) aiding and abetting the use of a firearm in relation to a drug-trafficking crime and committing a murder in the perpetration of a drug trafficking crime; and (3) knowingly traveling in interstate commerce with the intent that a murder for hire be committed. In addition, Mr. Sinisterra was found guilty on one count of criminal forfeiture. At the sentencing phase of the trial, the government requested that the death penalty be imposed on all three defendants. The jury returned a verdict that Mr. Ortiz should receive sentences of death on Counts Two and Three, and a custodial sentence of 324 months imprisonment on Count One; that Mr. Sinisterra should receive sentences of death on Counts Two and Three and a custodial sentence of 324 months on Count One; and that Mr. Tello should receive life imprisonment on Counts Two and Three, and a custodial sentence of 324 months on Count One.

I.

The events leading up to the murder which precipitated defendants' arrests are as follows. Edwin Hinestroza, a fugitive from justice, also charged with the above three Counts, ran a cocaine distribution ring in the Kansas City metropolitan area. He was assisted by Héberth Andres Borja-Molina ("Borja"). Cocaine shipments came from "La Oficina" ("the office" -- a drug cartel) in Colombia, South America, via Mexico. To transport the cocaine from Houston, where it first arrived from Mexico, Hinestroza used several individuals, including one of the defendants, German Sinisterra. The cocaine was delivered in vehicles with false compartments to one of

Hinestroza's five major customers on consignment, and the recipients were allowed several days to repay the drug debt. Once these debts were paid, money was sent back to Houston in the same vehicles used to transport the cocaine to Kansas City. Mr. Hinestroza lived in Kansas City with Monica Osma, the sister of Julian Colon (the murder victim). On November 19, 1998, the apartment Mr. Hinestroza and Ms. Osma shared was, by Ms. Osma's account, robbed, and $240,000 of drug proceeds was stolen.

One week later, Ms. Osma (recovering from injuries sustained during the reported robbery) was visited by Mr. Hinestroza, Jaime Hurtado (who worked for Hinestroza), and two Colombian males, the defendants Ortiz and Tello. Mr. Ortiz and Mr. Tello claimed to represent "La Oficina," or the drug cartel. They questioned Ms. Osma as to the robbery and were unconvinced by her account. They issued a death threat, using the word "Muracco" -- a colloquialism taken to mean that "La Oficina" would not be satisfied unless a dead body appeared. Two days later, in Kansas City, Mr. Hinestroza asked Borja and Colon to meet him at a hotel, where they were confronted by the three defendants, Mr. Ortiz, Mr. Sinisterra, and Mr. Tello. Borja testified that he knew both Ortiz and Sinisterra to be killers by trade. Borja and Colon accompanied the defendants to another house in Kansas City, where they were bound with duct tape and physically assaulted by Hinestroza, Ortiz, Sinisterra, and Tello, who demanded to know where the $240,000 in lost drug proceeds were. The beatings and demands continued, and Borja was dragged to the basement, where he overheard Mr. Hinestroza order the defendants to "shoot him [Colon] in the head" and then heard "shoot the other one, too."[1] Borja was also shot, but survived and pretended to be dead while he and the other victim, Mr. Colon, were placed in the trunk of a vehicle belonging to Borja. The vehicle was driven to a park where it and the bodies were abandoned.

---

[1]These conversations occurred in Spanish.

Borja escaped from the trunk of the car and eventually reached Mr. Colon's wife, who took him to the hospital, where police met with them. The three defendants were taken into custody within hours of the murder and attempted murder.

## A. German Sinisterra's Arrest and Interrogation

Officer David Martin of the Overland Park Police Department was asked to help take German Sinisterra from the Drury Inn in Overland Park to the Sanders Station. Officer Martin had no conversation with Mr. Sinisterra before he entered the booking area, at which point a videotape was started. Officer Martin read Mr. Sinisterra his rights and asked if he understood them, to which Sinisterra replied, "yes." Immediately afterwards he signed a <u>Miranda</u> rights waiver form (in English), although he was not asked if he could read. Chief John Douglass of the Overland Park Police Department asked Sinisterra several questions and concluded that Sinisterra understood him. When Chief Douglass learned that Sinisterra was a foreign national and not a United States citizen, he told Sinisterra that he had the right to contact his consul and that the police would let him do that. Sinisterra did not respond to this suggestion, and Chief Douglass concluded that he did not wish to contact his consul. Officer Martin did not give Mr. Sinisterra an opportunity to contact his consul. Sinisterra asked to be permitted to make a phone call, and was refused. As he later testified at the suppression hearing, he wished to call his wife, on whom he was accustomed to rely for help in communicating in English because of his limited education. He had completed the second grade in Colombia.

Deputy Herrera asked Mr. Sinisterra in Spanish if he could understand English, and he responded that he could understand both Spanish and English. Deputy Herrera thought that appellant's English was fair, and that he understood questions put to him. Deputy Herrera's Spanish was acquired growing up in a family (originally from Mexico) where Spanish was spoken, although his ability to write in Spanish is not good.

During a background interview conducted by Detectives Wilson and Sharp, Detective Wilson also concluded that Mr. Sinisterra understood what the detectives said to him, including questions put to him in English. Detective Sharp understood Mr. Sinisterra's responses in English. When presented with a <u>Miranda</u> rights waiver form, Mr. Sinisterra stated that he did not read English, whereupon Detective Sharp read the form out loud to him. At this point, appellant stated that he understood his rights, and signed the <u>Miranda</u> form. After a non-videotaped interrogation by Detectives Wilson and Sharp in which Mr. Sinisterra recounted the events leading up to the murder and his role in it, he agreed to provide a videotaped statement. Detective Sharp's impression during the videotaping was that Mr. Sinisterra understood the detectives' English. At no time did he ask for an interpreter, nor did the detectives offer him one.

Mr. Sinisterra stated that he had gotten a call in Houston from a man named "G.G." (identified as Edwin Hinestroza) who wanted him to come to Kansas City to get his stolen money back. Later the same evening, appellant met "G.G.," the victim, Julian Colon, and another person (Borja) at his motel in Kansas City. They drove to a house where Sinisterra and Hinestroza tied up two people. "G.G." asked Sinisterra to shoot Colon, and he agreed. He then shot the victim in the head and took him to the car.

In subsequent testimony, at the suppression hearing (conducted with the aid of a Spanish interpreter), appellant Sinisterra testified that he did not know that he had the right to refuse to talk to detectives during this interrogation, and that, had he known, he would have refused to talk to them. He also testified that he did not know that he had the right to ask for an American lawyer to represent him, and that, had he known of this right, he would have asked for a lawyer. He testified that he asked to be allowed to call his wife or someone else at least five times. He relies on his wife regularly for assistance in communicating in English. He also testified that he was asked if he needed an interpreter and said, "No," although he also claimed that he told

-6-

the officers questioning him that he understood very little English.  Appellant Sinisterra also stated that he was told he had the right to contact a consular official, but that he did not understand this right.

## B.  Arboleda Ortiz's Arrest and Interrogation

Mr. Ortiz was taken from the Drury Inn to the Sanders Station of the Overland Park Police Department by Patrol Officer Matthew Bregel.  During the booking process, Officer Bregel asked him for basic information (such as name and date of birth) and he responded normally. At this time, Officer Bregel advised Mr. Ortiz of his <u>Miranda</u> rights, and he said he understood them.  About an hour later, Officer Bregel asked appellant Ortiz to sign a <u>Miranda</u> waiver form, which he did.  At no time did appellant request an interpreter, and Officer Bregel understood appellant's responses and believed he understood what was said to him in English.  During the booking process, Deputy Herrera asked appellant if he understood English or Spanish.  Appellant responded in Spanish that he understood both English and Spanish.  Appellant was unable to read English, and responded to questions in Spanish, a language in which he was more comfortable.

Chief Douglass of the Overland Park Police Department asked Mr. Ortiz if he needed an interpreter and also advised him that he had the right to contact his consul. Chief Douglass had the impression that Mr. Ortiz had no interest in contacting his consul, but he could not testify that Mr. Ortiz said that he did not want to contact his consul.  Chief Douglass conducted these exchanges in English and believed that Mr. Ortiz understood him and that he understood Mr. Ortiz.

Detectives Kenney and Sharp conducted the interview of Mr. Ortiz, in which he was asked if he understood and spoke English, and he told Detective Kenney that he did.  The detectives conducted their interview in English, and both believed that the defendant understood them and was able to answer all of their questions without

difficulty. During the initial part of the interview in which detectives asked for basic information (about half an hour), Mr. Ortiz responded appropriately to questions, and also said that he had a seventh grade education and could not read.

Before the non-videotaped interrogation, Detective Sharp asked Mr. Ortiz if he understood his Miranda rights and would agree to sign a waiver form. Mr. Ortiz responded that he could not read English, and Detective Sharp read the Miranda waiver aloud to him, at which point Mr. Ortiz indicated that he understood his rights and signed the waiver form. Subsequently, detectives conducted a videotaped interview, with questions based on those asked and answered in the non-videotaped interview, in which Mr. Ortiz recounted the events leading up to the murder and his role in it. Neither Kenney nor Sharp was aware of the Vienna Convention on Consular Relations, and neither advised Mr. Ortiz of his right to have the Colombian consul advised of his arrest.

Mr. Ortiz stated that he had flown to Kansas City because he was called by someone who wanted help in getting stolen money back. He went to a house where the victim, Julian Colon and another person (Borja) had been taken. He took the other person (Borja) downstairs, taped him up, and beat him. He denied having any role in the shootings.

Special Agent Oyler of the FBI arranged for a team of agents and police officers to transport all three appellants from the Johnson County Adult Detention Center in Olathe to the federal courthouse in Kansas City, Missouri. Special Agents Oyler and Tongate transported defendant Ortiz, who began talking to them. The agents stopped Mr. Ortiz from talking, advised him of his rights, and asked him if he understood English. He said yes. Mr. Ortiz subsequently spoke to the agents about his family in Houston and stated that he did not shoot anyone.

Appellant Ortiz testified at the suppression hearing (conducted with the aid of a Spanish interpreter) that he cannot read or write in any language, that he speaks some English, and that he first entered school at about the age of fourteen in Colombia. He also denied that officers ever explained to him that he had a right to remain silent, a right to a lawyer, or that he had a right to call his consul. He also stated that at no time did officers advise him of his <u>Miranda</u> rights or give him the opportunity to stop the conversation. He testified that he asked to telephone his wife, and that he was told by the agent of whom he made this request that he was to have no communication. He stated that had he known that he had the right to refuse to answer questions, he would have refused, and had he known that he had the right to call his consul, he would have called his consul. He also stated that he did not know what the word "waiver" meant.

### C. Plutarco Tello's Arrest and Interrogation

Appellant Tello was arrested and taken to the Overland Park Police Department. Detectives Dillenkoffer and Martin of the Kansas City Police Department went to the Overland Park Police Department but did not interview Mr. Tello until he was transferred to the Johnson County Adult Detention Center. On their arrival they were told that Mr. Tello was anxious to talk to them. Detective Dillenkoffer testified that Mr. Tello spoke very little English, but Detective Martin had the impression, because of Tello's answers, that he understood questions put to him in English. During their interview, the detectives questioned Mr. Tello through Deputy Herrera, who spoke Spanish, and on whom they relied exclusively for translation of their questions and Mr. Tello's answers. Deputy Herrera had not previously done simultaneous translations or Spanish translations for formal questioning.

Mr. Tello told Deputy Herrera that he wanted to talk, that "something went wrong and I want to get it out," a request the deputy conveyed to the detectives.

Detective Dillenkoffer asked Deputy Herrera to advise Mr. Tello of his <u>Miranda</u> rights and provided one of the department's Spanish <u>Miranda</u> waiver forms. The detective explained the form to Deputy Herrera, as well as the Kansas City Police Department's procedure for using the form with suspects. He asked Deputy Herrera to read the <u>Miranda</u> form verbatim to Mr. Tello and to advise him of his <u>Miranda</u> rights in Spanish. Mr. Tello had no questions about what Deputy Herrera told him, did not ask for an attorney, or indicate that he did not want to talk. When asked if he understood his rights, Detective Martin testified that defendant Tello responded with a "yes" in English. At times during the questioning, Mr. Tello responded in English. Deputy Herrera translated when he responded in Spanish. During a non-videotaped portion of the interview, Mr. Tello was asked by detectives if he understood his rights, a question translated by Deputy Herrera. After these questions and answers, Mr. Tello signed the <u>Miranda</u> waiver form in Spanish and asked no further questions about the form.

Because Mr. Tello was eager to talk, Detective Dillenkoffer did not conduct his usual pre-interview, but did advise him of his <u>Miranda</u> rights. Based on the booking questions and initial interrogation of Mr. Tello, Deputy Herrera had no reason to believe that Mr. Tello did not understand his Spanish. Throughout the interview Detective Dillenkoffer's impression was that appellant was eager to talk, that he responded to questions without hesitation and understood them, and that he did not wish, or attempt to, stop the interview at any point. Later, Mr. Tello was asked to videotape his statement, and agreed. He did not ask for a lawyer at any point, or indicate that he wished to stop talking.

Mr. Tello stated that he had come from Texas with co-appellant Sinisterra the day before to help Hinestroza retrieve money from Colon. They met Colon and Borja and got into a car with them and Mr. Tello drove them to another house, where they bound and taped the two victims. Tello and Ortiz took one victim downstairs while Hinestroza and Sinisterra remained upstairs. Mr. Tello and Mr. Ortiz beat the person

downstairs, and when Mr. Tello heard a gunshot he went upstairs and observed Mr. Sinisterra standing over the victim (Colon). While upstairs, Mr. Tello heard a gunshot from the basement. He also stated that he knew in advance what would happen in the house and knew that he would be paid. He had a gun with him which he later disposed of and, after these events, he did not attempt to get medical treatment for the victims.

At one point during the videotaped statement, Detective Dillenkoffer asked Mr. Tello if he understood his rights, and the detective interpreted Mr. Tello's response "Si, si es necessito un abogado,"[2] as an affirmation that appellant understood his rights and had begun to repeat them. Deputy Herrera did not translate the word "abogado" ("lawyer" in Spanish) for the detectives.

During the transfer from the Johnson County Adult Detention Center to the federal courthouse, Agent Meads of the FBI, who speaks Spanish, stopped Mr. Tello from talking to give him his <u>Miranda</u> warnings in Spanish. When asked if he understood his rights, appellant responded "yes," and continued to talk.

Appellant Tello testified at the suppression hearing (conducted with the aid of a Spanish interpreter) that, at the time of his arrest, he was not informed of his right to have the Colombian consul notified of his arrest, and that, had he been informed of this right, he would have asked that the police call the Colombian consul. He also testified that, had the consul or an attorney explained to him the importance of not speaking to the police without first talking to an attorney or having an attorney present, he would have refused to answer questions during his police interview. Appellant also indicated that, at the point on the videotape where he used the word

_____

[2]We have omitted any accents from this phrase in Spanish. The spoken word "sí," with an accent, meaning "yes," and the spoken word "si," without an accent, meaning "if," sound exactly the same. The ambiguity thus created will be discussed later.

-11-

"abogado," he was requesting an attorney, and that he told the officers that he did not understand his rights. He stated that he continued talking to detectives without comprehending his rights because he believed he would be hit if he did not do so.

As the recommended findings of the magistrate judge[3] indicate, appellants Sinisterra and Ortiz were advised by Chief John Douglass of the Overland Park Police Department that under the Vienna Convention on Consular Relations they could contact their consulate, although appellants dispute the effectiveness of this notification. In Mr. Sinisterra's case, although he was told that he had a right to notify his consul and that he would be given this right, nothing further was said or done on the matter either by the police or by Sinisterra. Chief Douglass testified that he would have used the same language to appellant Ortiz in notifying him of his right to have the Colombian consul notified of his arrest. As the Government concedes, Mr. Tello was not advised of his right to consular notification either at the time of his arrest or at the time of his transfer to the custody of the FBI. Each of the defendants was advised of his Miranda rights, and then waived those rights and gave videotaped statements to the police.

Appellants Ortiz and Sinisterra contend that their limited comprehension of English made the brief explanation of their Miranda rights in English ineffectual, and meant that their subsequent statements to police were neither knowing nor voluntary. According to Dr. Warren Wheelock, a Professor of Education at the University of Missouri at Kansas City, Mr. Sinisterra is functionally illiterate in English. Mr. Ortiz contends that, because no one read or explained his Miranda rights to him in Spanish, he did not intelligently waive his Fifth and Sixth Amendment rights.

_____

[3]The Hon. Sarah W. Hayes, United States Magistrate Judge for the Western District of Missouri.

Appellant Tello claims that he did not effectively waive his Fifth and Sixth Amendment rights, given the language barrier. Agent Jimenez of the FBI, who has served as an interpreter on fifteen occasions for government wiretaps involving Spanish-speaking individuals, reviewed the videotape of Mr. Tello's statement to check for errors and miscommunications. He concluded that, although Deputy Herrera's Spanish was "poor" or "not very good," the government's transcript and translation of that interview was accurate, and that Mr. Tello, in the sentence in which he used the word "abogado," was not trying to ask for an attorney, but only reciting what he understood to be his rights.[4] Dr. Yolanda Ayubi, a Colombian native who holds a Ph.D. in post-cultural communication, testified that when Tello was advised of his Miranda rights at one point during the interview, he asked which rights.

Carlos Negret, formerly Consul General for Colombia in Chicago, Illinois, stated that he was not contacted concerning the arrests of any of the three appellants. In addition, he indicated that, had defendants made the request, he would have informed them of their right to an attorney. Dale Close, the legal advisor to the Kansas City, Missouri, Police Department, testified that he was unaware of the Vienna Convention before the questioning of Mr. Sinisterra and Mr. Ortiz and that it was not the policy of the Kansas City Police Department to advise an arrested foreign national that he could notify his consul.

On these facts, the District Court[5] found that the defendants understood their rights and voluntarily waived them. Accordingly, the motions to suppress

---

[4]As previously noted, the meaning of the sentence depends on the placement of accents. If the sentence reads, "Sí, si es necessito un abogado," it means, "Yes, if it is [that] I need a lawyer." If the sentence reads, "Sí, sí, es necessito un abogado," it mean, "Yes, yes, it is [that] I need a lawyer." The District Court found the former meaning was, in context, more plausible. This finding is not clearly erroneous.

[5]The Hon. Gary Fenner, United States District Judge for the Western District of Missouri.

defendants' confessions were denied. As to the Vienna Convention, the District Court concluded that it had been violated. Ortiz and Sinisterra were told of their rights under the Convention, but they were also told, according to the findings of the District Court, that the police would help them exercise these rights, or would give them an opportunity to exercise them. No such opportunity was ever afforded. On the contrary, defendants were not permitted to make any telephone calls. In Mr. Tello's case, there was no notification whatever of his right to get in touch with the Colombian Consul. The District Court held, however, that violation of the Vienna Convention created no individually enforceable rights in appellants. In addition, the Court found that appellants would have made the same statements even if the Convention had been fully complied with. They had requested, as a remedy for the violation, either that the death penalty be excluded as a possible result, or that their confessions be suppressed. This request was denied.

## II.

We review the factual findings of the District Court under the familiar clearly-erroneous standard. Conclusions of law based on those findings, such as whether a confession was voluntary, are reviewed de novo. United States v. Syslo, -- F.3d --, W.L. 31000286 (8th Cir. 2002); United States v. Casal, 915 F.2d 1225, 1228 (8th Cir. 1990). A waiver of the Fifth Amendment privilege against self-incrimination is valid only if it is made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966). A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421 (1986). The District Court found, as we have noted, that the defendants were adequately advised of their Miranda rights, and that they understood these rights. There was evidence pointing both ways, but this finding is not clearly erroneous, nor do the District Court's conclusions suffer from any error of law.

-14-

We address in particular defendants' arguments based on the Vienna Convention on Consular Relations, 21 U.S.T. 77, TIAS No. 6820. Two portions of the Treaty are relevant. First, the Preamble includes the following explanatory clause:

> Realizing that the purpose of such privileges and immunities is not to benefit individuals but to ensure the efficient performance of functions by consular posts on behalf of their respective States . . ..

21 U.S.T. at 79. This provision, the government argues, indicates that the Treaty creates no individual rights, enforceable by detained persons, but only a right in the governments that are parties to it to complain to each other of violations.

By contrast, Article 36 of the Treaty provides as follows:

> 1.   With a view to facilitating the exercise of consular functions relating to nationals of the sending State:
>
> (a)   consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with and access to consular officers of the sending State;
>
> (b)   if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody, or detention shall also be forwarded by the said authorities without delay. The

-15-

said authorities shall inform the person concerned without delay of his rights under this sub-paragraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody, or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody, or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody, or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.

21 U.S.T. at 100-01. In particular, the provision in Article 36(1)(b) that "[t]he . . . authorities [of the receiving State] shall inform the person concerned without delay of <u>his</u> rights under this subparagraph" (emphasis ours), appears to recognize that the person detained does have rights under the Treaty. The antecedent of the pronoun "his" in this sentence is "the person arrested, in prison, custody or detention," a phrase occurring in the immediately preceding sentence.

As we noted in <u>United States v. Santos</u>, 235 F.3d 1105, 1107-08 (8th Cir. 2000), the federal courts are not in agreement as to whether Article 36 of the Convention creates a right enforceable by an individual who has been arrested. <u>Compare</u>, <u>e.g.</u>, <u>Standt v. City of New York</u>, 153 F. Supp. 2d 417 (S.D. N.Y. 2001) (individually enforceable right is created); <u>United States v. Hongla-Yamche</u>, 55 F. Supp. 2d 74 (D. Mass. 1999), <u>with</u>, <u>e.g.</u>, <u>United States v. Emuegbunam</u>, 268 F.3d 377 (6th Cir. 2001); <u>United States v. Jimenez-Nava</u>, 243 F.3d 192 (5th Cir.), <u>cert. denied</u>,

-16-

533 U.S. 962 (2001); United States v. Li, 206 F.3d 56, 61 (1st Cir. 2000) (en banc) (Selya, J. and Boudin, J., concurring). The Supreme Court has not directly addressed the issue, though it has said that the Convention "arguably confers on an individual the right to consular assistance following an arrest." Breard v. Greene, 523 U.S. 371, 376 (1998) (per curiam).

As we understand defendants' contentions in this Court, their major position is that a violation of the Vienna Convention, in and of itself, renders their statements inadmissible, entirely apart from whether the statements were voluntary. We disagree. Even if we assume for present purposes that the Convention creates an individually enforceable right, it would not follow, on this record, that the statements should be excluded merely because the Convention has been violated. The reason is that appellants are unable to establish a causal connection between the violation and their statements. The District Court found: "No credible evidence suggests that had defendants been advised of their right to have their Colombian consul notified of their arrest, they would not have made the statements." Opinion of Magistrate Judge at 33. This finding is not clearly erroneous.

Consul Negret does not say that he would have advised appellants not to make their statements to the police. No doubt he would have informed them of their rights, including the right to obtain counsel, and would have done so in Spanish. But they had already been adequately informed of this right. There is no evidence that receiving this information from the consul would have changed their conduct. In other words, there is no evidence that defendants, if they had been given proper consular access, would have chosen not to waive their Miranda rights. So far as we can tell, the course of the trial would not have been changed at all. Furthermore, the Vienna Convention does not require that interrogation cease until consular contact is made. The interrogation in this case occurred on a Sunday. If defendants had been allowed to telephone the consul, they could not have reached him. The most that could have been done was to leave a message on the consulate's voice mail, and the

consul would have returned the call the next day. By that time, defendants, fully informed of their rights under Miranda, had already confessed. In other words, defendants have shown no prejudice, and therefore the violation of the Vienna Convention is of no avail to them, even if the violation is assertable by an individual detained person.

Defendants also argue that an appropriate remedy for the violation of the Convention is a prohibition on the government's seeking the death penalty. Again, even assuming that the Convention creates individually enforceable rights, this conclusion does not follow. There is no causal or logical connection at all between the penalty imposed on defendants and violation of the Vienna Convention. The death penalty is provided by statute. It comes into the case, of course, only after defendants are convicted. We have already seen that their own incriminating statements, potent evidence supporting the conviction, would have been made even if consular contact had occurred. The Convention itself says nothing about the appropriateness of penalties, and certainly does not provide that the death penalty is excluded if the Convention is violated. We do not believe that courts are authorized to create such a remedy. As the Supreme Court has said, "it is extremely doubtful that . . . violation [of the Convention] should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." Breard, 523 U.S. at 377. Similarly, we have no warrant for overturning the sentence without some showing that the violation had an effect on it.[6]

In short, this record contains no evidence that violations of the Vienna Convention in the case of these defendants prejudiced them in any way. That

---

[6]A similar thought occurred to Judge Oda of the International Court of Justice in the LaGrand case. Germany v. United States, 1999 I.C.J. 9, 19: "[I]f consular contact had occurred at the time of Mr. Walter LaGrand's arrest or detention, the judicial procedure in the United States domestic courts relating to his case would have been no different" (declaration of Oda, J.).

-18-

violations occurred is a fact, but it is a disembodied fact. Courts have no authority to enforce the law, including treaties, in a vacuum, so to speak. Our job is simply to decide the cases that come before us, and to do so in a way that is just as between the parties. That the Convention was violated in these cases is not something to be proud of. The position of the Kansas City Police Department, apparently determining as a matter of policy that no notification of rights under the Convention will ever be made, is disturbing, to say the least. "Great nations, like great men, should keep their word." Federal Power Commission v. Tuscarora Indian Nation, 362 U.S. 99, 142 (1960) (Black, J., dissenting). Although the Department of State has made an effort in recent years to advise federal, state, and local law enforcement agencies how to comply with Article 36(b)(1), prior cases demonstrate that this nation's overall compliance record leaves a good deal to be desired. This fact, however, does not automatically translate into relief for particular defendants in particular cases.

For the reasons given, we conclude that the motions to suppress defendants' confessions were properly denied.

III.

The defendants contend that their Sixth Amendment right to be tried by a fair and impartial jury was violated in this case. They argue that these rights were violated on a number of grounds. First, they say, the trial court's failure to conduct a "searching" voir dire precluded them from receiving enough information to exercise intelligently, peremptory challenges, failed to reveal any potential prejudice in the venire, and prevented the trial court from striking certain veniremen whose responses to various questions suggested that they might not be impartial. Second, they argue that the trial court failed to conduct a proper examination of the venire during the death-penalty-qualification phase of the trial. Third, defendants say the trial court improperly questioned potential jurors regarding their feelings about immunized witnesses during general voir dire. And fourth, it is asserted that the government

-19-

incorrectly struck certain jurors because of race.  All three defendants' arguments have been combined for the purposes of this opinion.  After conducting a thorough review of the record before this Court, we hold that the defendants' Sixth Amendment rights were not violated.

The Sixth Amendment guarantees "the criminally accused a fair trial by a panel of impartial, indifferent jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961) (internal quotations omitted); see also Pruett v. Norris, 153 F.3d 579, 584 (8th Cir. 1998). Voir dire serves the purpose of assuring a criminal defendant that this right will be protected.  See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981).  "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.  Similarly, lack of adequate voir dire impairs the defendants' right to exercise peremptory challenges . . .."  Id. (internal quotations omitted).  Voir dire may be conducted by the parties' attorneys or by the court.  Fed. R. Crim. P. 24(a).  If the trial court chooses to conduct voir dire, "the parties may supplement the examination by such further inquiry as the court deems proper; alternatively, the court may limit participation to the submission of additional questions, which the court must ask only as it deems proper."  Rosales-Lopez, 451 U.S. at 189 (internal quotations omitted).  Trial judges have broad discretion in determining how best to conduct voir dire, though this discretion is not without boundaries. See Harold v. Corwin, 846 F.2d 1148, 1150 (8th Cir. 1988).  Because the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's rulings absent an abuse of discretion, United States v. Bear Runner, 502 F.2d 908, 911 (8th Cir. 1974); see also Wainright v. Witt, 469 U.S. 412, 428 (1985).  The reason given is that juror bias "cannot be easily discerned from an appellate record." Wainwright, 469 U.S. at 429.  Our standard of review mandates that a trial court's decision to strike a juror for cause be reversed only where a defendant can show actual prejudice.  See United States v. Blum, 65 F.3d 1436, 1442 (8th Cir. 1995).

-20-

In this case, voir dire was conducted by the trial court. Initially, the Court provided each member of the venire a questionnaire of 103 questions. Appellee's Addendum A 1-31. This questionnaire covered a multitude of subjects, including, but not limited to, racial bias, personal views regarding the death penalty and the legalization of certain drugs, and personal experiences involving law-enforcement officers. After the jurors had completed the questionnaires, the Court allowed strikes for cause to be made by the parties on the basis of responses to questions contained in the questionnaire. After these strikes were made, and the Court had either granted or denied such strikes, the Court divided the remaining pool into three equal groups. The Court advised the parties that each group would be brought into the courthouse for general group voir dire,[7] after which the Court would conduct individual death qualification outside of the presence of the other potential jurors. The parties were then asked to submit any supplemental questions that they wished the Court to consider. After the Court had received such requests, it advised the parties that it intended to conduct the entire voir dire and that it "intended to adopt many of the proposed changes in [the Court's] general voir dire as suggested by [the parties' attorneys]." Appellee's Addendum C. The Court conducted voir dire on three consecutive days in the manner described, conducting general voir dire, then individual death qualification, until 77 persons remained.

## A. Racial Bias

The defendants contend that this process was insufficient. Specifically, the defendants suggest that the Court failed to examine thoroughly the racial biases of particular veniremen. Moreover, they argue that the Court erred in failing to strike for cause at least one juror who they believe showed evidence of racial bias. We disagree.

---

[7]The general voir dire consisted of fourteen questions. See Appellee's Addendum C.

A court is constitutionally required to inquire into potential jurors' racial prejudices if "ethnic or racial issues are inextricably intertwined with conduct of the trial, or if the circumstances in the case suggest a significant likelihood that racial prejudice might infect the defendant's trial." United States v. Borders, 270 F.3d 1180, 1182 (8th Cir. 2001); see Rosales-Lopez, 451 U.S. at 190. If "substantial indications" of racial prejudice exist in a particular case and a trial court denies a defendant's request to examine a venireman's ability to be impartial, this inaction may be characterized as "an unconstitutional abuse of discretion." Borders, 270 F.3d at 1183 (internal citation omitted).

Even in cases when such implications do not exist, and further inquiries are not constitutionally required, the best practice is to allow defendants to choose whether they would like "an inquiry into racial or ethnic prejudice in order to avoid the appearance of injustice." Id. When examining whether a potential juror holds any racial or ethnic prejudices the questions do not have to be of a specific type, neither must the court ask any particular questions. See Bear Runner, 502 F.2d at 912. In the past, we have held that general questioning on the subject of race is sufficient. See United States v. Thompson, 490 F.2d 1218, 1222 (8th. Cir. 1974). However, we have also suggested that the better practice is to ask "direct probing questions" of individual veniremen, "particularly . . . when the overall circumstances and surroundings suggest the possibility of racial bias." Bear Runner, 502 F.2d at 912.

The Court first inquired into whether any juror held any ethnic or racial prejudices that could potentially affect him or her in this case by means of the questionnaire that the Court provided to every prospective juror.

44.    Do you believe that certain races or ethnic groups tend to be more violent than others?

Yes  _____        No  _____

If your answer is yes, please indicate which races or ethnic groups you believe to be more violent.

45.    Have you ever had a bad experience involving a person whose race is different from yours?

Yes   \_\_\_\_\_        No  \_\_\_\_\_

If your answer is yes, please describe any such experience.

46.    How would you feel if a family of a different race moved next door to you?

\_\_\_\_\_        I would favor it

\_\_\_\_\_        I would be indifferent because the race of my neighbors makes no difference to me

\_\_\_\_\_        I would oppose it

47.    The defendants in this case are Black and are accused of killing a Hispanic person. Would the race or ethnicity of the defendants or victim be important to you in deciding between a life sentence and the death penalty?

a.    Yes, victim \_\_\_\_\_      No  \_\_\_\_\_

b.    Yes, defendants  \_\_\_\_\_      No  \_\_\_\_\_

c.    If yes to a or b, please explain your answer.

48.    Do you have any feelings toward any racial or ethnic group which would cause you to judge a member of that group differently than

you would judge a member of your own racial or ethnic group?

Yes  _____  No  _____

If yes, please explain.

Appellee's Addendum A 12-13.

The Court further examined the venire on this subject during general voir dire. The Court stated:

> Ladies and gentlemen, although the defendants in this case are from the country of Colombia, they have African heritage. Some people indicated on their questionnaires that they have had difficulty with a person or persons of a different race or that they would oppose having a person of a different race as a neighbor or that they believed certain races to be more violent. Is there anyone here who expressed such a belief and because of your belief, or for any other reason, feels that you would be less likely to believe the position of a black person, or a person from Colombia, as opposed to anyone else merely because of their race or nationality?

Appellee's Addendum C 5. There were no responses to this question.

During death-penalty qualification of the potential jurors, the Court asked several individuals additional questions on the subject of racial or ethnic prejudice. The defendants argue that more questions were necessary during this individual questioning. We will not discuss every person that the defendants contend was inadequately examined, but will include certain examples to address the defendants' argument.

-24-

Several potential jurors responded to question number 44 of the questionnaire that they believed that certain races were more violent than others. For example, Juror number 17, Jimmie Jones, stated in his questionnaire that in his opinion "intercity people, being both black and white, tend to be more violent." Tr. 115. When the Court asked if he felt "that the fact that the defendants in this case are from another country, from Colombia, and the fact they're African Heritage would cause you in any way not to be impartial in this case," he responded, "[o]h, I don't think so, I didn't have that knowledge at the time I filled that out and my only facts for making that statement is reading the paper, I guess, it's really not fair but that is what you read and that's what you understand." Tr. 116. When the Court asked further if he felt that the defendants' nationality or race would be a consideration for him in either determining guilt or determining punishment, he stated, "I don't think so, sir. A man is a man." Id. He then stated that he would be able to listen to the evidence in this case and make a decision based solely on the evidence and the law as instructed. Id. There was no error in the Court's inquiry. This venireman stated that he would not consider race when determining guilt or punishment, and that he would make a decision based solely on the evidence presented. Any further questioning would have been superfluous.

Similarly, the defendants contend that juror number 69, Vicky Borland, and juror number 98, Jacqueline Betts, were not examined adequately. Ms. Borland and Ms. Betts both stated in their questionnaires that they believed that Hispanics and African Americans were more violent. However, they both stated that the race of the defendants would not affect any decision they might have to make in this case, and that they could be impartial to the defendants. Tr. 328, 450. Again, we believe further examination was not necessary.[8] In addition, the defendants used a peremptory strike to remove Ms. Borland.

---

[8]Similar arguments were made with regard to juror number 33, Judy Schott.

The defendants also contend that juror number 114, William Pecota, should have been more thoroughly questioned. Mr. Pecota played baseball in Colombia for a few months nearly twenty years ago. The Court asked Mr. Pecota several questions regarding his experience in Colombia and whether this would tend to make him "believe the charges against the defendants without hearing the evidence against them." Tr. 505. Mr. Pecota responded that it would not. Id. He also stated that he thought that he could make a decision in this case solely on the evidence presented. Again, we find that the Court's inquiry was sufficient to reveal any potential prejudices held by Mr. Pecota.

Juror number 26, Thomas Jones, and juror number 104, Mark Fricke, raise a slightly different concern. Mr. Jones responded in his questionnaire that he believed certain races were more violent, though he did not identify a particular race. When the defendants' attorneys requested further questioning from the Court, this request was denied. Mr. Fricke did not respond to the "pertinent" race questions on the questionnaire, and the Court also denied further questioning of Mr. Fricke. Tr. 469. Though the Court could have chosen to examine further these individuals, we do not believe that failure to do so was an abuse of discretion. The Court did ask during general voir dire whether the fact that the defendants were of African heritage would hinder the ability of each person to be impartial. Neither of these veniremen responded. More importantly, neither of these veniremen served on the jury; therefore, no actual prejudice was suffered.

The defendants also argue that the Court should have struck at least one juror on account of his racial bias. The defendants contend that juror number 31, Kenneth Whisler, should have been struck for cause. Mr. Whisler indicated in his questionnaire that he believed that African Americans were more violent than other races. However, he did not "think" that the fact that the defendants were from Colombia would "impact his ability to be impartial." Tr. 162. When the Court further inquired whether "the fact that the defendants have African . . . heritage would

in any way weigh on your decision at that part of the trial or any other," he responded, "[n]o, sir." Tr. 164. We will uphold a trial court's decision whether to strike a juror for cause unless the defendants can illustrate actual prejudice. See United States v. Mills, 987 F.2d 1311, 1314 (8th Cir. 1993). In the present case, not only did Mr. Whisler state that he could be impartial, he did not serve on the jury. Because the necessity of using a peremptory strike does not establish actual prejudice, we find no abuse of discretion by the trial court.

## B. Individual Death Qualification

We now turn our attention to the death qualification of the potential jurors. The defendants urge this Court to hold that the trial court in the present case failed to conduct a searching voir dire on this issue, and that the Court failed to strike for cause jurors who suggested in their responses to the Court's questions that they might not be impartial. We do not agree with the defendants' contentions.

The standard for the exclusion of a venireman on the basis of his inability to consider a death-penalty verdict properly was articulated in Witherspoon v. Illinois, 391 U.S. 510 (1968). The Supreme Court stated "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id. at 522. In its opinion, the Court stated that this standard did not change the ability of a court to excuse a juror who states that he would "automatically vote against the imposition of capital punishment without regard to any evidence" presented to the Court or "that [his] attitude toward the death penalty would prevent [him] from making an impartial decision as to the defendant's guilt." Id. at 522 n.21.

In a later case the Court noted that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or

substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). Even a juror who has stated that he does not believe in the death penalty might be able to sit as a juror if he can follow the trial judge's instructions and "consider fairly the imposition of the death sentence in a particular case." Id. at 44-45 (citing Boulden v. Holman, 394 U.S. 478, 483-84 (1969)). Moreover, bias does not have to be "evident from voir dire with 'unmistakable clarity' because many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear.' " Kinder v. Bowersox, 272 F.3d 532, 543 (8th Cir. 2001) (internal citations omitted).

In their briefs, the defendants provide many examples of potential jurors that they feel the Court should have struck for cause, or improperly struck for cause, because of these individuals' willingness vel non to sentence the defendants to death. We will again include only a sample of these examples in our discussion in order to analyze the defendants' arguments, paying close attention, first, to those individuals who served on the jury in this case.

The first inquiry that the Court made with regard to the death penalty was in the juror questionnaire. Each person was asked:

4.      How would your feelings about the death penalty affect you if you served as a juror in a case and had to choose between the death penalty and a sentence of life imprisonment without possibility of parole? (Please read all of the statements, take some time to think, and then mark all of the choices which you believe describe your feelings.)

   a.      I am opposed to the death penalty, and I will never vote to impose the death penalty in any case, no matter what the facts.

-28-

b.      I am opposed to the death penalty, and I would have a difficult time voting to impose the death penalty.

c.      I am opposed to the death penalty, but could vote to impose the death penalty if I believed that the death penalty was called for in light of the facts and the law in the case.

d.      I have no definite opinion for or against the death penalty. I could vote to impose the death penalty, or I could vote to impose a sentence of life imprisonment without parole, whichever I believed was called for in light of the facts and the law in the case.

e.      I am in favor of the death penalty, but I could vote for a sentence of life imprisonment without possibility of parole if I believed that sentence was called for in light of the facts and the law in the case.

f.      I am strongly in favor of the death penalty, and I would have a difficult time voting against the death penalty.

g.      I am strongly in favor of the death penalty, and I would vote for the death penalty in every case in which the person charged is eligible for a death sentence.

h.      None of the statements above correctly describes my feeling about the death penalty.

41.   Please describe your feelings about the death penalty in your own words. How strong are those feelings and how long have you had them?

Appellee's Addendum A 11.

The Court inquired further into the jurors' views during the individual death penalty qualification. It is with these individual interviews that the defendants are most concerned.

The defendants first contend that juror number 7, Jaqueline Craig, should have been struck for cause. Ms. Craig stated in her questionnaire that she "had no definite opinions either for or against the death penalty" and that she could vote to impose either punishment. Tr. 67. Ms. Craig also stated in her questionnaire that she believed an "individual should be responsible for their actions and that evidence would have to show an intent to murder for the death penalty to be imposed." Id. When questioned further on this matter, she stated that she believed that she could vote for either punishment after considering any aggravating or mitigating circumstances, and that she would not "automatically" vote one way or the other if she found that a murder had been intentionally committed. Tr. 68. We see no error in the Court's failure to strike Ms. Craig, who ultimately served on the jury. Ms. Craig did not indicate that she would favor one penalty or the other, and she did not state that she would be unable to follow the procedure outlined by the Court.

The defendants also argue that juror number 10, Linda Watson, should have been removed by the Court for cause. Ms. Watson also served on the jury in this case. First, we note that the defendants did not move to strike Ms. Watson following her qualification. Ms. Watson stated in her questionnaire that she was in favor of the death penalty but she could vote for life imprisonment. Tr. 80-81. She also stated in her questionnaire that she would vote for the death penalty "if the evidence prove[d] it." Tr. 81. When the Court asked Ms. Watson if she could follow the process of evaluating the mitigating and aggravating factors and consider both options of punishment, she stated "[y]es." Id. Again, we do not believe that the Court erred in failing to strike Ms. Watson. She clearly indicated that she could consider both options as to punishment.

-30-

The defendants in this case moved to strike numerous other prospective jurors who they felt would be inclined to vote for a sentence of death, rather than life imprisonment without parole. After reviewing the individual questioning of all veniremen, we shall discuss only the denials by the Court that are potentially of most concern.

The Court denied the defendants' motion to strike juror number 33, Judy Schott. Ms. Schott stated in her questionnaire that she "was in favor of the death penalty but could vote for a sentence of life imprisonment without the possibility of parole if [she] believe[d] the sentence was called for in light of the facts and the law in the case." Tr. 170. She also stated, "if a person deliberately planned to commit a murder they deserved the death penalty because [she did] not believe a taxpayer should have to keep these people alive." Id. When asked "if a person committed a murder with premeditation, . . . would [she] feel that under those circumstances that [she] would automatically vote for the death penalty," she stated that she "would be inclined to, yes." Tr. 171. When she was asked again, "if a person was convicted of murder that [she] would not be able to consider both forms of punishment and that she would automatically vote for one form or the other," she replied, "[n]o, I don't believe I would automatically vote one way or the other." Id. The Court then inquired into her feelings regarding the taxpayers' burden of keeping someone in prison. She stated that she was not sure if that would be a consideration when determining the appropriate form of punishment. When asked a second time if she thought the expense of keeping someone in prison would make it difficult for her to vote for life in prison, she stated, "[n]o." Tr. 172-73.

Similarly, juror number 74, Joseph Terranella, juror number 97, Samuel Goth, and juror number 106, Lee Gabbert, all expressed strong feelings in favor of the death penalty. Mr. Terranella stated in his questionnaire that he was "strongly in favor of the death penalty" and "would have a difficult time voting against it." Tr. 345. He also stated that he "believe[s] there is biblical support for the death penalty." Id. Mr.

Goth stated in his questionnaire that he was "strongly in favor of the death penalty and would vote for it if a person was eligible." Tr. 443. He also made the remark, "[i]f they took somebody else's life, knowingly was doing it, I don't feel like they should live either." Tr. 445. Mr. Gabbert noted in his questionnaire that he believed in "an eye-for-an-eye and those that take lives on purpose should pay the price." Tr. 473. Moreover, when the Court asked Mr. Gabbert "if there was an intentional murder committed you would then believe that the punishment automatically should be imposition of the death penalty," he responded, "[p]robably in most cases, yes, sir." Tr. 474.

However, each of these jurors ultimately stated that they could follow the procedure outlined by the Court and weigh all mitigating and aggravating circumstances before imposing punishment. For example, Mr. Terranella responded affirmatively to the Court's question of whether he could vote for either form of punishment. Tr. 347. Mr. Goth also responded, "yes," there would be "circumstances where [he] would feel the appropriate punishment would be life imprisonment." Tr. 445. Similarly, Mr. Gabbert responded, "[y]es, sir, I think I could, yes, sir," when asked if he could consider life imprisonment as punishment for someone found guilty of committing intentional murder. Tr. 475-76.

We do not believe that the Court abused its discretion in failing to strike particular persons on the basis of their view on capital punishment. Each of the potential jurors ultimately stated that he could consider life imprisonment without parole as a possible punishment, and that he could follow the procedure as instructed by the Court. This holding is consistent with our decision in Ramsey v. Bowersox, 149 F.3d 749 (8th Cir. 1998). In Ramsey, we found no error when a trial court failed to strike two potential jurors who stated that "they were capable of voting for either the death sentence or life imprisonment without parole" but then indicated that their tendency would be to lean towards the death penalty. Id. at 758. Because the two jurors had responded that they would be able to consider either sentence and would

not impose either sentence automatically after hearing the Court's statements about aggravating and mitigating factors and "the necessity of the prospective jurors' ability to follow the instructions," we upheld the Court's decision that they were "qualified to sit as impartial jurors." Id. Compare Hatley v. Lockhart, 990 F.2d 1070, 1072 (8th Cir. 1993), in which we held that the trial court properly excluded a potential juror who stated that she would "automatically" vote for life imprisonment.

## C. General Voir Dire Inquiry Regarding Immunity

The defendants also argue that the Court improperly questioned prospective jurors regarding their feelings about the credibility of immunized witnesses during general voir dire. Essentially the defendants contend that the general voir dire question tended to lend credibility to the government witness who was granted immunity. The Court asked the following question:

> Some witnesses who are expected to testify have been granted immunity from prosecution.
>
> a. Does anybody feel that plea bargains or grants of immunity are wrong, improper, or somehow unfair?
>
> b. Would you tend not to believe the testimony of an individual who has pled guilty pursuant to a plea agreement simply because that witness entered into that agreement or has been given immunity?
>
> c. Does anyone believe or feel it is wrong or improper for an individual to agree to plead guilty and cooperate with the government to identify and testify about others involved in the criminal activity?
>
> d. Would you be able to be fair, impartial and unbiased in your evaluation to the testimony of witnesses who are convicted of offenses or have been granted immunity and have agreed to testify?

Appellee's Addendum C 4.

-33-

Only one government witness, Héberth Andres Borja-Molina, was granted immunity in this case. Mr. Borja-Molina is a young man who was intimately acquainted with the drug activity of the defendants. A similar instruction was upheld by this Court in United States v. Eagle Hawk, 815 F.2d 1213 (8th Cir. 1987). In that case, we held that the inquiry into the use of immunized testimony was "completely impartial," and within the broad discretion trial courts are afforded in determining how to conduct voir dire. Eagle Hawk, 815 F.2d at 1219. We believe that the inquiry made in this case was also impartial and was well within the Court's discretion. A juror who chooses to disbelieve a witness because that witness has been granted immunity is in no way behaving improperly. But a potential juror's attitude towards immunized testimony is relevant, because it could help the parties exercise their peremptory challenges.

## D. The Batson Claim

The defendants contend that the government unconstitutionally used four of its peremptory challenges to strike jurors because they were black. In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that it is a violation of the Equal Protection Clause to use peremptory strikes solely on the basis of race. In order to establish a prima facie case of purposeful discrimination, a defendant must prove the following:

> that he is a member of a cognizable racial group . . ., and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,' . . .. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96 (citations omitted).

Once a defendant establishes a prima facie case, the burden shifts to the prosecution to provide race-neutral reasons for excluding the veniremen in question. Id. at 97.

The defendants contend that the government unconstitutionally used peremptory strikes to remove juror number 3, Anthony Wesson, juror number 66, Glorus Hill, juror number 89, Cynthia Roe, and juror number 129, Ruthie Ashley. The defendants argue that similarly situated Caucasians remained on the jury. We believe the government provided sufficient race-neutral reasons for removing these venire members.

The government justified each of its strikes. It struck Mr. Wesson because he had no views on the death penalty, he had indicated that he had been treated badly by the police, and had been placed in a line-up wrongfully. In addition, he created the appearance of possible bias during the voir dire process by paying particular attention when the defendants read their witness list and paying little attention when the government presented its list to the Court, Tr. 823.

The government struck Ms. Hill because, according to the government's attorney, older jurors seem to have a more difficult time sentencing someone to death "because they are facing their own mortality," Tr. 826. She was approximately the same age as a white woman, juror number 94, Rosemary Pilsl, who was not struck, but Ms. Pilsl, unlike Ms. Hill, had indicated that accountability was important to her.

The government struck Ms. Roe because it believed that Ms. Roe's response in her questionnaire that she "tried not to let anything or anybody steal her joy," Tr. 828, hinted that she might be "out there somewhere," Tr. 829. The government was also concerned that Ms. Roe might be sympathetic to the defendants because she had a son who was on probation for a drug charge, and she did not like the way he was treated when she went to visit him.

The government struck Ms. Ashley because she indicated on her questionnaire that she was opposed to the death penalty, and she was the only person who remained on the venire who selected answer "c" in response to the question on the questionnaire regarding her feelings on the death penalty. This answer indicated that she was "opposed to the death penalty, but could vote to impose the death penalty if she believed that the death penalty was called for in light of the facts and the law in the case." Tr. 831.

We agree with the District Court that the government provided sufficient race-neutral reasons for using peremptory strikes on these jurors. The government's proffered reasons are supported by the record. We do not believe that there was any constitutional error. "We cannot say that the trial court clearly erred in finding that the [government] lacked discriminatory motivation." Shurn v. Delo, 177 F.3d 662, 665 (8th Cir. 1999).

III.

The defendants make a variety of other contentions, which we address in turn.

A. Admission of Gruesome Photographs

Mr. Tello argues that the Court erred in admitting photographs of the murder victim. We review a District Court's decision to admit evidence for an abuse of discretion. United States v. Payne, 119 F.3d 637, 645 (8th Cir. 1997). Under Federal Rule of Evidence 403, "relevant photographs of a victim should be admitted unless [they are] 'so gruesome or inflammatory that [their] prejudicial impact substantially outweighs [their] probative value.'" United States v. Davidson, 122 F.3d 531, 538 (8th Cir. 1997) (quoting United States v. Petary, 857 F.2d 459, 463 (8th Cir. 1998)).

The photographs at issue here show the victim's bloody corpse and are graphic. However, they also have significant probative value. They corroborate the testimony

of the government's key witness, Mr. Molina, establish that the victim had been bound with duct tape and beaten before his murder, and support the government's contention that the crime was particularly heinous and depraved. We agree with the District Court that the probative value of this evidence is not substantially outweighed by its prejudicial effect. We affirm the Court's denial of the motion to exclude this evidence.

## B. Severance

Mr. Tello and Mr. Sinisterra[9] argue that the District Court abused its discretion in denying their motions for severance. We disagree. The defendants cannot show that the joint trial resulted in prejudice that denied them a fair trial.

Mr. Tello filed two motions for severance. The first motion raised three grounds: (1) that the use of the co-defendants' statements would violate Mr. Tello's confrontation rights and be contrary to Bruton v. United States, 391 U.S. 123 (1968), (2) that a joint trial would prevent an individualized assessment of Mr. Tello's guilt, and (3) that Mr. Tello and Mr. Ortiz had antagonistic defenses. His second motion, which was repeatedly renewed during trial, contended that the District Court's redaction of Mr. Tello's statement to resolve the Bruton issues raised by his co-defendants removed information exculpatory of Mr. Tello, thereby prejudicing him. Mr. Sinisterra made a pre-trial motion for severance based on Bruton problems created by the redacted confessions of his co-conspirators and on having a defense antagonistic to that of Mr. Tello.

---

[9]This Court has granted Mr. Ortiz's motion to adopt the arguments made in the briefs of his co-defendants. However, we cannot identify when, if at any time, Mr. Ortiz made a motion for severance in the District Court. He does not claim in his brief to have done so, and we cannot locate such a motion. If Mr. Ortiz did not file a motion, this failure constitutes a waiver, see Fed. R. Crim. P. 12, and our review is for plain error. At any rate, Mr. Ortiz was not entitled to a separate trial for the same reasons given in our affirmance of the denial of his co-defendants' motions.

The decision to grant a defendant severance from joint trial is committed to the discretion of the district court. United States v. Wint, 974 F.2d 961, 966 (8th Cir. 1992), cert. denied, 506 U.S. 1062 (1993); Federal Rule of Criminal Procedure 14. We will affirm a district court's decision to deny a motion for severance "absent an abuse of discretion resulting in clear prejudice." United States v. Johnson, 944 F.2d 396, 402 (8th Cir.), cert. denied, 502 U.S. 1008 (1991).

Both Mr. Tello and Mr. Sinisterra argue that the joint trial was improper because each had a defense that was antagonistic to another defendant. This does not, as a matter of law, require severance. Zafiro v. United States, 506 U.S. 534, 538 (1993). Neither Mr. Tello nor Mr. Sinisterra convinces us that the facts of this trial required severance based on antagonistic defense theories. While a defendant who tries to minimize his role while emphasizing the participation of other actors "may have a better chance of acquittal in [a] separate trial[,]" this does not entitle him to severance. Id. at 540. Severance is mandated only when there is a danger "that the jury will unjustifiably infer that this conflict [between the antagonistic defenses] alone demonstrates that both are guilty." United States v. Spitler, 800 F.2d 1267, 1272 (4th Cir. 1986).

Mr. Tello and Mr. Ortiz each claimed that the other shot Mr. Molina. While only one man committed that act, the government's theory of the case did not require the jury to decide who shot Mr. Molina. The indictment charged defendants with crimes, including conspiracy and aiding and abetting, that did not require jurors to choose a particular defendant as the shooter.

Also, Mr. Sinisterra argues that his defense was at substantial odds with Mr. Tello's. He does not specifically state the nature of the irreconcilability, see Spitler, 800 F.2d at 1272, but instead simply alleges that Mr. Tello introduced evidence unfavorable to him. This type of "finger-pointing" does not constitute an irreconcilable defense. Mr. Sinisterra cannot demonstrate clear prejudice merely by showing that "one defendant trie[d] to shift blame to another defendant." United

-38-

States v. Mason, 982 F.2d 325, 328 (8th Cir. 1993). Juries can decide where the blame lies.

We also reject the argument that severance was warranted because a joint trial prevented the jury from making individualized assessments of guilt. This risk is always present in joint trials, which remain favored by the law. See Zafiro, 506 U.S. at 537. Further, we note that Federal Rule of Criminal Procedure 14 does not require severance to cure prejudice, but allows courts to order "whatever other relief justice requires" in the particular situation. The District Court instructed the jury to consider the evidence against each defendant individually. "Keep in mind you must separate considerations of the evidence about each individual defendant. Each defendant is entitled to be treated separately." Tr. 2427. These instructions, combined with the ample evidence of guilt the government introduced at trial, persuade us that there is not "an appreciable chance that [defendants] would not have been convicted had separate trials been granted." Mason, 982 F.2d at 328. Therefore, defendants cannot establish either an abuse of discretion in refusing to grant severance, or that clear prejudice resulted from that decision.

The defendants next argue that they were prejudiced by joint trial because the redacted portions of the confessions that were introduced in evidence omitted exculpatory statements, misled the jury about the defendant's participation, or damaged a defendant's theory of defense. All three defendants made statements to police at the time of their arrest. The government introduced these statements through the testimony of the interrogating police officers, who recounted for the jury each defendant's version of the crime. Each defendant told a different story, but each one implicated himself and his co-defendants in some part of the crime.

Defendants have a Sixth Amendment right to confront the witnesses against them. They also have a Fifth Amendment right not to be made witnesses against themselves. In a joint trial, these rights collide when co-defendants implicate each other in confessions that are introduced into evidence. In Bruton, the Supreme Court

-39-

held that instructing the jury to consider the confession of a particular defendant only against that defendant, and not against his co-defendant, was insufficient to resolve this problem. 391 U.S. at 137. Instead, if the government wants to introduce the confession of co-defendants that implicate each other, the statements must be redacted to eliminate "not only the defendant's name, but any reference to his or her existence." Richardson v. Marsh, 481 U.S. 200, 211 (1987). Our Court has interpreted this requirement to allow the admission of confessions so long as the confession is redacted to avoid either facially implicating or leading the jury directly to non-testifying co-defendants. See United States v. Edwards, 159 F.3d 1117, 1125 (8th Cir. 1998), cert. denied, 528 U.S. 825 (1999).

Courts have used several methods to redact confessions, including replacing proper names with pronouns or nondescriptive nouns like "another person." See United States v. Akinkoye, 185 F.3d 192, 198 (4th Cir. 1999), cert. denied, 528 U.S. 1177 (2000); Edwards, 159 F.3d at 1125-26. In this case, the police officers phrased their answers in the passive voice to avoid the need to name the co-defendants. For example, in introducing the content of Mr. Ortiz's statement, the prosecutor and police officer had the following exchange:

"Did he [Ortiz] indicate to you what happened to these victims?"

"Yes."

"What?"

"They were physically beaten and then they were shot."

"Were they ever taped up?"

"Yes."

Tr. 2106. This technique of introducing the content of the confessions does not

implicate the declarant's co-defendants. The jury was not told who beat up, shot, and taped up the victims, just that these actions occurred. They were not led straight to the conclusion that the actions described were committed by any particular defendant. See United States v. Long, 900 F.2d 1270, 1279-80 (8th Cir. 1990). The jury could have concluded that any or all of the defendants were involved in these activities or that they were conducted by the fugitive, Mr. Hinestroza. The method used by the District Court to redact defendants' confessions satisfies the requirements of Richardson v. Marsh as we have construed them and did not violate any defendant's rights.

Defendant Tello argues that he was prejudiced by joint trial because when his confession was redacted, exculpatory statements were omitted, and he was portrayed in a less favorable light than he would have been if his entire confession had been introduced. In his brief, Mr. Tello gives two examples of exculpatory statements that were redacted and argues that these examples show that he was prejudiced by a joint trial. Defendant Tello's Brief 75-76. However, our review of the confession revealed two other times when Mr. Tello communicated essentially the same exculpatory information in a manner that did not implicate his co-defendants, and so survived redaction. In his first example, Mr. Tello states that he was upstairs when he heard a shot downstairs. He is asked who was downstairs at that time and stated that Mr. Ortiz was. The exculpatory part of this exchange is that Mr. Tello says that he was not in the basement when the shot was fired there. He conveys this in another place in his statement, which was not redacted. "Then I heard . . . another shot down there. . . . Much later I heard another shot downstairs." Defendant Tello's Appendix 49. Mr. Tello could have introduced this part of the confession in evidence to convey the same exculpatory information that he complains was redacted.

The same is true of Mr. Tello's second example, in which he states that he came to Kansas City "with the purpose, of, er, to be with my cousin [unintelligible]. . . . It was later that they told me about that." Mr. Tello contends that this statement provides a defense to the charge that he traveled in interstate commerce with the

intent to commit murder. This may be true; however, a similar statement denying that he came to Kansas City to help Mr. Hinestroza with criminal activity was not redacted and could have been placed in evidence. Defendant Tello's Appendix 57. Because the same content that was redacted was present in a slightly different form in the edited version of his statement, Mr. Tello cannot show clear prejudice from the redaction of his confession. See United States v. Comeaux, 955 F.2d 586, 590 (8th Cir.), cert. denied, 506 U.S. 845 (1992) (holding that the rule of completeness requires severance only when the redacted version prevents a defendant from introducing "substantially exculpatory" statements.) Accordingly, we hold that the District Court did not abuse its discretion in trying Mr. Tello with his co-defendants in a joint trial.

## C. Jury Instruction Issues

Appellants make several arguments that the jury was instructed incorrectly during the penalty phase. Four separate errors of this type are alleged. First, defendants contend that Instructions 1 and 11 impermissibly used the verb "shall," which defendants argue informed the jury that it was required to impose a death sentence. Instruction No. 1, in relevant part, stated that:

> If you unanimously find the aggravating factor, or factors, which you all found to exist sufficiently outweighs any mitigating factor, or factors, which any of you found to exist to justify imposition of a sentence of death or if, in the absence of a mitigating factor, or factors, you find the aggravating factor, or factors, alone are sufficient to justify imposition of a sentence of death, the law provides that the defendant shall be sentenced to death.

Tr. 2574-75. Instruction No. 11 contained almost identical language.

We reject defendants' contention that these instructions were incorrect. The Federal Death Penalty Act, 18 U.S.C. § 3591(a), uses almost identical language in

-42-

laying out the statutory scheme for the imposition of the death penalty.

> A defendant . . . shall be sentenced to death if, after consideration of the factors set forth in section 3592 [delineating possible aggravating and mitigating factors] . . . it is determined that imposition of a sentence of death is justified.

18 U.S.C. § 3591(a). As we explained in United States v. Allen, 247 F.3d 741, 780-81 (8th Cir. 2001), vacated on other grounds, 122 S. Ct. 2653 (2002), the "shall" language correctly repeats the law to the jury: under § 3591(a)(2) "a unanimous finding that death is justified requires a recommendation of a death sentence." The District Court did not err in this regard. Allen is binding on this panel.

Next, Mr. Sinisterra argues that the instructions on the multiple-attempted-killing aggravating factor were unconstitutional and not supported by evidence. The District Court gave the following instruction on this factor:

> Three, the defendant in concert with others, intentionally attempted to kill more than one person in a single criminal episode.

Tr. 2577 (penalty phase of German Sinisterra, Instruction No. 1). Mr. Sinisterra contends that this instruction was incorrect as a matter of law. He argues that there can be no liability as an accessory for an aggravating circumstance. This is not correct. Although "individualized consideration [i]s a constitutional requirement in imposing the death sentence," Lockett v. Ohio, 438 U.S. 586, 605 (1978), an aggravating factor can be based on liability as an accessory. See Buttrum v. Black, 721 F. Supp. 1268, 1319 (N.D. Ga. 1989). Allowing a jury to consider that the defendant acted jointly in determining aggravating circumstances is consistent with the rule that a defendant can be sentenced to death in some circumstances even though he only aids and abets the killing. See Tison v. Arizona, 481 U.S. 137 (1987).

-43-

Here, the District Court's instruction did not tell the jury that it could punish Mr. Sinisterra for his co-defendants' actions. Instead, it correctly stated that the jury could consider whether Mr. Sinisterra acted with others in intentionally attempting multiple killings. A defendant does not have to kill multiple people personally to meet the aggravator; he need only have had an intention to attempt multiple killings. This is true whether he acted alone or whether, as in this case, he acted with others. Here, there was ample evidence that Mr. Sinisterra intentionally attempted to kill multiple persons. Cf. United States v. Allen, 247 F.3d 741, 787 (8th Cir. 2001), vacated on other grounds, 122 S. Ct. 2653 (2002) (upholding jury's finding of "grave risk of death" statutory aggravating factor because evidence, viewed in light most favorable to government, was sufficient to support finding).

Defendants also argue that there was insufficient evidence to support the instruction on the non-statutory aggravating factor of future dangerousness. They contend that this instruction used vague language that did not sufficiently guide the jury's determination. The government is required to give a capital defendant notice of any aggravating factor it intends to prove at trial, see 18 U.S.C. § 3953(c), and to provide evidence that adequately establishes the existence of the factor alleged. See United States v. Nguyen, 928 F. Supp. 1525, 1542 (D. Kan. 1996). In the penalty phases of Mr. Sinisterra and Mr. Ortiz, the government specified two types of evidence it would use to support the future-dangerousness aggravating factor: lack of remorse for the crime and the use of physical force and threats of violence to collect drug debts and enforce discipline for Edwin Hinestroza. Tr. 2578 (Sinisterra); Tr. 2948 (Ortiz). The government alleged only the second type of evidence, which the parties term "enforcer" evidence, against Mr. Tello.

In reviewing the sufficiency of the evidence to support an aggravating factor, we view the evidence in the light most favorable to the government and consider whether any rational trier of fact could have found the aggravating circumstance beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). We conclude that there was adequate evidence of all three defendants' acting as

-44-

"enforcers" using physical force and threats to collect drug debts and enforce discipline. Two witnesses testified as to Mr. Sinisterra's reputation as an "enforcer," including one who repeated Mr. Sinisterra's offer to "pop" a guy for $2,000. Tr. 1218, 1220. These statements, along with the evidence of the crimes of conviction, are sufficient to support instructing the jury on future dangerousness.

The government also produced enough evidence to establish the defendants' lack of remorse. In so doing, the government permissibly relied on evidence introduced at trial, such as the defendants' demeanor during their videotaped statements to the police. See United States v. Davis, 912 F. Supp. 938, 946 (E.D. La. 1996) ("[i]nformation admissible in the guilt phase undoubtedly may be argued and considered by the jury in the penalty phase"). The evidence of the disposal of Mr. Colon's body and Mr. Sinisterra's admission that he planned on going drinking after getting paid for the murder both show a lack of remorse for the crime. The jury was properly instructed that it could consider this evidence in deciding whether to find the future-dangerousness aggravating factor.

We also review the language of the District Court's instruction on future dangerousness and conclude that it did not contain reversible error. Before Mr. Sinisterra's[10] penalty phase hearing, the parties discussed the instruction, which described the aggravating factor as follows:

One, future dangerousness based on the probability that German Sinisterra would commit criminal acts of violence that would constitute a continuing threat to society as evidenced, *for example*, by one or more of the following, *among others*.

_____

[10]Mr. Ortiz and Mr. Tello had separate penalty-phase hearings. The future dangerousness instruction used by the Court varied slightly at their hearings. The "among other" language was not used, but the phrase "for example" was in each instruction. Neither defendant objected, so our review is for plain error. We conclude there is none for the same reasons given for rejection of Mr. Sinisterra's contentions about this instruction.

Tr. 2578 (emphasis added). The instruction then listed the defendant's lack of remorse and behavior as an "enforcer," the factors discussed above. In a pre-hearing conference with the District Court, the government conceded that "there is no 'among other' evidence that is going to be presented." Tr. 2572. The defendant was apparently satisfied with this explanation, as he raised no further objections, and the hearing began, with the jury being given the instruction (as given above) at the start of the hearing. This instruction was repeated at the conclusion of the penalty phase trial, except that the "among others" language was deleted.

In his brief, Mr. Sinisterra argues that the instruction was vague and failed to guide the jury's discretion sufficiently in making a sentencing decision. Because defendant did not object to the instruction, as given by the District Court at either the start or the finish of the trial, our review is for plain error. The Supreme Court has held that a death penalty phase jury must have "clear and objective standards that provide specific and detailed guidance." Lewis v. Jeffers, 497 U.S. 764, 774 (1990) (citation omitted). The phrases "among others" and "for example" are open-ended and could distract the jury from focusing on whether the government has provided sufficient evidence on "lack of remorse" and "enforcer" behavior to support the factor. In this case, however, the use of this language does not rise to the level of a "miscarriage of justice" or an error that "seriously undermine[s] the fairness, integrity, or public reputation of judicial proceedings." United States v. Yellow Hawk, 276 F.3d 953, 955 (8th Cir. 2002) (internal citations omitted). The District Court omitted the "among others" phrase in its final instruction, which the jury is presumed to follow. Also, neither party mentioned this language in its arguments, and the government relied simply on the evidence presented at trial to support future dangerousness. In light of these factors, and the defendants' failure to object, we will not reverse on this basis.

Defendants' last contention about the penalty-phase jury instructions is that the overall tenor of the instructions, read as a whole, misled the jury by minimizing its responsibility and implying that sentencing decisions would be made by the Court instead of the jury. There was no error in asking the jury to record its findings at each

-46-

step. This process does not, contrary to defendant's suggestion, relegate the jury to the status of reporter or indicate that the Court would decide the defendant's sentence. The Court told the jury that "you will then engage in a weighing process" and "whether or not the circumstances in this case justify a sentence of death is a decision the law leaves entirely to you." Tr. 2866. These statements specifically rebut the defendants' argument that the jury did not understand its role as the decision-maker of the sentence.

## D. Improper Closing References

During closing arguments in Mr. Sinisterra's penalty phase trial, the prosecutor made reference to Adolph Hitler, Charles Manson, and Jeffrey Dahmer. Appellants did not object to these references at trial so our review is for plain error. United States v. Robinson, 110 F.3d 1320, 1326 (8th Cir.), cert. denied, 522 U.S. 975 (1997). The prosecutor made these references when arguing that a family's love for a convicted criminal should not excuse the criminal's behavior. Tr. 2891. The prosecutor was not directly likening appellants' crimes or characters to those of Hitler, Manson, or Dahmer. Instead, the thrust of his argument was that familial love should not outweigh the aggravating circumstances of a crime in deciding on the appropriate punishment. This type of reference is not "prejudicial enough to deprive [the] defendant[s] of [their] constitutional rights to a fair penalty phase hearing." United States v. Allen, supra, 247 F.3d at 776. We reach this conclusion after considering that there was only a single reference to these famous criminals, and that defendants failed to object at that time. The prosecutor's behavior did not "seriously affect the fairness, integrity or public reputation" of the penalty-phase hearing. United States v. Olano, 507 U.S. 725, 736 (1993).

## E. Videotaped Mitigating Evidence

Finally, Mr. Sinisterra argues that the District Court erred in its handling of videotaped testimony of his family members that he presented as mitigating evidence

in the penalty phase. Specifically, Mr. Sinisterra alleges that the limiting instruction that the Court gave to the jury before it heard the video evidence was improper. He also argues that his Eighth Amendment right to have the jury consider all relevant mitigating evidence was violated because the United States did not issue visas for his family members to travel from Colombia to testify on his behalf, and that because of this alleged violation he was entitled to a directed verdict for life imprisonment at the close of the penalty phase. We reject these arguments.

Before defense counsel presented the videotape testimony, the Court instructed the jury that the defendant had attempted to secure the presence of the videotaped witnesses but could not do so, that the government had not been given the tapes until April 28th (the tapes were introduced on May 1st), and that the jury could consider the government's inability to cross-examine the witnesses in deciding what weight, if any, to give to the videotaped interviews. Tr. 2713. This instruction was permissible. The government was entitled to cross-examine defendant's witnesses, and its inability to do so with videotape testimony is a factor going to the evidence's reliability. Our independent reading of the instruction does not persuade us that the District Court's instruction placed blame on defendants or their counsel for the limits of the videotape evidence. Instead, we believe that the Court was correctly explaining to the jury the circumstances and limitations of this evidence so that they could exercise discretion in weighing the evidence. There was no abuse of discretion in the District Court's handling of this matter.

The United States government did not issue visas to Mr. Sinisterra's relatives or grant them humanitarian parole to enter this country to testify as witnesses on his behalf. No party to this lawsuit explains why permission to enter the country was denied. It is not contended that the government was acting to obstruct the defendants' case, or that the relatives were eligible by law for visas. Tr. 2670. Regardless of the reason for the denials, defendants cannot show that prejudice resulted from their inability to introduce live testimony by their family members. The videotaped testimony of family members, while perhaps not so effective in some ways as live testimony, was

sufficient to allow Mr. Sinisterra to inform the jury of his family background. The video testimony also had certain advantages over live testimony; defendants were able to edit the tapes, and the tapes showed visually the poverty of defendants' village and family background. Therefore, Mr. Sinisterra's Eighth Amendment right was not abridged by his having to use video testimony, and he was not entitled to a directed verdict of life imprisonment on this matter.

## IV.

We have attempted to review each of defendants' arguments with the care that the gravity of these cases demands. Having done so, we find no error of law in the action of the District Court. Accordingly, its judgments are

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.