**UNITED STATES of America, Appellee,**

v.

**Gary Wayne EGGLETON, Appellant.**

**No. 85–1858.**

United States Court of Appeals,
Eighth Circuit.

Submitted March 13, 1986.

Decided Aug. 20, 1986.

Lee T. Lawless, Asst. Federal Public Defender, St. Louis, Mo., for appellant.

Frederick R. Buckles, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

HANSON, Senior District Judge.

Eggleton appeals his conviction for bank robbery, alleging that the district court erred in admitting evidence on the theory of flight, admitting evidence of other crimes, overruling his motion to suppress identification evidence, and imposing an excessive sentence. For the reasons stated below, we affirm the decision of the district court.[1]

## I. BACKGROUND.

On the evening of November 27, 1983, a woman knocked on the door of the Crystal City, Missouri home of Robert Smith, the president of Commerce Bank of Festus, Missouri. Mrs. Smith opened the door to give the woman directions and a man came through the door, pushing Mrs. Smith into the foyer and onto the floor. Mrs. Smith's daughter was also pushed to the floor. When Mr. Smith came downstairs with his son Jason, they were met by a man pointing a .30 caliber carbine at them. When Mr. Smith reached the bottom of the stairs, he saw a second gunman pointing a machine gun at his wife and daughter. The two men pushed Mr. Smith and Jason down to the floor and handcuffed Mr. Smith's hands behind his back. One of the gunmen then displayed what appeared to be a bomb. Mr. Smith was at this point taken aside and told that the men were there to rob the bank the next morning.

At the time the men came to the house they wore ski masks over their faces. However, the mask worn by one of the men slipped back around his face as he struggled with Mr. Smith and Mrs. Smith saw a portion of his face, including his brow, eyes, nose, mouth, and cheekbones.

At about 5 a.m. the following morning one of the gunmen took Mr. Smith to prepare to go to the bank. After tying up the rest of the family in the basement and telling them that there was a bomb attached to the basement door, the gunmen took Mr. Smith to the bank, using Mr.

Smith's car. A ski mask was put over his face and he was forced to lie down on the back seat of the car.

After arriving at the bank, the gunmen positioned themselves one at the front door and one at the back door. As the employees arrived, Mr. Smith greeted them and took them to an area designated by the robbers. He explained that the bank was being robbed and that his family was being held hostage. After the time lock opened on the vault door, the robbers took the money, herded the bank employees into the vault, and shut the door. The men then fled. Mr. Smith waited until 8:30, then let the employees out, and called the police. Meanwhile, at the Smith house, Mrs. Smith and the children had untied themselves and found there was no bomb attached to the basement door.

Following the incident, Mrs. Smith prepared a composite drawing of the woman who knocked on the door and of the gunman whom she had caught a glimpse of under his ski mask. The FBI agent in charge of the case was able to identify the woman in the drawing as Carol Martin. He contacted Martin to question her about any knowledge she might have of the robbery. After her initial denial of any knowledge, she admitted her involvement in the robbery and identified the persons involved in exchange for her not being prosecuted. Martin admitted that she had been the woman who knocked on the door of the Smith residence. She said that the others participating in the robbery were Michael Wright, Frank Enriquez, and Wayne Eggleton, with Enriquez and Eggleton being the pair of gunmen who invaded the Smith home. In addition, Martin then gave the agent considerable information about the preparation for the robbery and what had happened subsequent to the robbery.

Based on the information provided by Martin, the FBI obtained arrest warrants for Wright, Enriquez, and Eggleton. Al-

---

**1.** The HONORABLE CLYDE S. CAHILL, United States District Judge for the Eastern District of Missouri.

though Enriquez and Wright were arrested, the FBI was unable to arrest Eggleton because he had left the area. Following Wright's arrest, he agreed to cooperate with the government in the investigation in exchange for the dropping of all charges against him but that for conspiracy to rob the Festus bank. Wright confirmed the information provided by Martin and provided additional details. He described how they had made the bomb that was shown to the Smiths, and how he had thrown the bomb and other explosive devices into the Meramec River. The bag containing the devices was later found on the Meramec River bank on January 1, 1984.

The evidence showed that Eggleton had left his home in North Carolina on December 16, 1983. From there he traveled for the next thirteen months, going to Florida, the Dominican Republic, Kentucky, Costa Rica, Tennessee, and Texas. During this time he took an assumed name, obtaining various kinds of identification under that name.

On July 23, 1985 Eggleton was arrested in El Paso, Texas by the FBI. At the time of his arrest he was heavily armed. He wore a shoulder-holstered .357 caliber pistol. In the car agents found a loaded M-14 rifle, several incendiary devices, several knives, a machete, and various other pieces of military field gear.

Following his arrest, Eggleton was taken to the St. Louis area where he was placed in a lineup viewed by Mrs. Smith. She identified him as one of the gunmen who had broken into her home on November 27, 1983. She also identified him at trial.

One of the witnesses at the trial was Lynn West, a friend of Eggleton, who testified that he had spoken to Eggleton before the eventual arrest and urged him to turn himself in. Eggleton told West that he would prefer to "take his chances on the outside."

Eggleton testified that he had been in the St. Louis area at the time of the bank robbery, but did not participate in the robbery of the Commerce Bank or the invasion of the Smith home. Rather, Eggleton claimed that he and Enriquez had swindled Michael Wright and others who had given them money with which to purchase drugs. Eggleton thereafter fled the area, believing that those that he had robbed had a contract with the Mafia to kill him. It was only later, he alleges, that he learned that the police wanted to arrest him for the robbery of the Commerce Bank.

At the close of the trial, the jury returned a guilty verdict, and the judge sentenced him to forty-five years imprisonment.

## II. THEORY OF FLIGHT EVIDENCE.

At the trial, the court gave the jury the following instruction as consciousness of guilt:

Instruction No. 20.

The intentional flight or concealment of a defendant immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not of course sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case, in determining guilt or innocence. Whether or not evidence of flight or concealment shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury.

In your consideration of the evidence of flight you should consider that there may be reasons for this which are fully consistent with innocence. These may include fear of being apprehended, unwillingness to confront the police, or reluctance to appear as a witness.

Eggleton claims that, while overruling his motion for a mistrial at the close of the government's case, the court stated that the government had not introduced evidence of flight. However, during its closing argument the government argued the theory of flight and concealment as evidence of guilt.

Evidence of the flight of an accused after a crime has been committed is admissible in that it tends to prove consciousness of guilt. *United States v. Peltier*, 585 F.2d

314, 323 (8th Cir.1978), *cert. denied,* 440 U.S. 945, 99 S.Ct. 1422, 59 L.Ed.2d 634 (1979). Although the circuits are divided on whether it must be shown that the person attempting to flee had reason to believe that he was being, or would be, sought in connection with the commission of a particular crime, this Circuit allows the theory of flight evidence when there is an awareness of guilt. We stated in *Peltier* that:

> Analytically, flight is an admission by conduct. Its probative value as circumstantial evidence of guilt depends upon the degree of confidence in which four inferences can be drawn: (1) from the defendant's behavior in flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

585 F.2d at 323. The validity of drawing an inference of guilt depends on the number of evidentiary manifestations suggesting that the defendant's decision to flee was prompted by considerations related to the crime in question. *Id.*

After the robbery, Eggleton returned to his home in North Carolina where he got a telephone call from Enriquez telling him that the FBI was looking for them. A short time later Eggleton tried to call Enriquez and was told by his wife that "some men" had taken him away. The FBI had arrested Enriquez. At this point Eggleton left home, leaving his wife and family behind.

In February of 1984 Eggleton called Lynn West looking for a place to stay for a while. He told West he was "in trouble with the law." Sometime later West, a deputy sheriff in the State of Florida, was contacted by the FBI and told that Eggleton was wanted for robbery. West spoke several times on the phone with Eggleton and told him of the charges against him. West offered to be a middleman between Eggleton and the FBI. Eggleton asked what might happen if he turned himself in, and West told him that he would likely face a substantial prison term. Eggleton replied that he would rather "take his chances on the outside." According to Eggleton, he learned that the FBI was looking for him on the bank robbery charge when he called Lynn West from Costa Rica. Eggleton returned from Costa Rica in July 1984 and thereafter traveled around the country until his arrest on January 23, 1985.

In order to be admissible, it is not necessary for the flight to have occurred immediately after the robbery had taken place. We held in *Peltier* that flight which occurs a substantial time after the crime is admissible when there is evidence that the defendant fled to avoid apprehension. *Id.* at 324. The evidence demonstrates that Eggleton left home immediately after talking to Enriquez' wife in order to avoid the FBI. It is apparent that he knew he was wanted for the charge of bank robbery in the St. Louis area. Knowing this, Eggleton took an assumed name in order to conceal his identity and fled in order to avoid apprehension. He took his chances on the outside and the evidence of his flight can reasonably lead to his consciousness of his guilt. We must therefore conclude that the trial court did not err in admitting evidence of the defendant's flight and instructing the jury of such evidence.

### III. EVIDENCE OF OTHER CRIMES, INCLUDING POSSESSION OF WEAPONS, EXPLOSIVES, AND FALSE IDENTIFICATION.

██ Eggleton alleges that it was error to admit evidence of his false identification and his possession of weapons and explosives. Evidence of the defendant's use of false names and identification is relevant and admissible to show consciousness of guilt. *United States v. Silverman,* 771 F.2d 1193, 1199–1200 (9th Cir.1985); *United States v. Boyle,* 675 F.2d 430, 432 (1st Cir.1982). Eggleton admitted that he had assumed the identity of Timothy Turpin in order to prevent his detection and apprehension. As a result, this evidence was admissible to show his consciousness of his guilt.

██ Eggleton also alleges that the court erred in admitting evidence of a number of

explosive devices found in his car at the time of his arrest. The robbers had used a "dummy" explosive device to intimidate the Smiths to remain in the basement while they robbed the bank. At the time of his arrest, Eggleton's car contained glass jars with electrical tape around the lids and fuses sticking out of holes in the top of the jars. These devices were identical to the ones used in the robbery and were therefore circumstantial evidence to show Eggleton's identity as one of the bank robbers. While evidence of other crimes, wrongs, or acts is not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it, the evidence may be offered as it was in this case to prove the identity of the accused as one of the criminals. Rule 404(b), Federal Rules of Evidence. Although there is no doubt that this evidence was highly prejudicial to Eggleton, in that the jars were identical to those used by the robbers, it was also relevant to show his identity as one of the robbers and was therefore admissible at trial.

■ Eggleton also alleges that it was error to admit evidence of the .357 magnum pistol which he had in his possession at the time of his arrest, a loaded M–14 automatic rifle which was in the car, brass knuckles which were in his rear pocket, as well as a machete and bayonet which were in the trunk of his car. Ordinarily, the admission into evidence of weapons which are unrelated to the crime is prejudicial to the defendant and is held to be reversible error. *Peltier*, 585 F.2d at 327. We have no doubt that the connection between the weapons seized from Eggleton at his arrest and the weapons used in the crime is rather attenuated. The weapons therefore were not admissible under Rule 404(b) as connecting Eggleton to the assault on the Smith home or the subsequent bank robbery. Nevertheless, we believe the weapons were relevant to show Eggleton's attempt to flee from the FBI. Together with the evidence that Eggleton was aware that the FBI was searching for him, that he fled his home as soon as he learned that he was

being sought by the FBI, that he took an assumed name, and that he traveled for the next thirteen months to avoid apprehension, admission of the weapons into evidence is cumulative evidence leading to the inference of his guilt of the crime charged. We therefore cannot conclude that the district court erred in admitting into evidence the weapons seized from Eggleton at the time of his arrest.

## IV. LINEUP IDENTIFICATION.

■ Eggleton alleges that the identification made by Mrs. Smith at trial should have been excluded, first because it was a product of undue suggestion and second because it was not reliable. Mrs. Smith testified that she had a good view of a portion of the gunman's face for some ten to fifteen minutes while his ski mask was pulled back during the struggle with her husband. She testified that she saw the gunman's face, including his brow, eyes, nose, mouth, and cheekbones. After the robbery, she testified him to be five feet, nine inches, thin, and clean-shaven. Evidence presented at trial demonstrates that at the time of the robbery Eggleton was six feet tall, of medium build, and bearded with a mustache. Without regard to the discrepancy about whether Eggleton was bearded, on April 4, 1985 Mrs. Smith gave a positive identification of Eggleton from a five-man lineup as being the robber whose mask was pulled back.

Eggleton asserts that the lineup was unduly suggestive in that Mrs. Smith had been told by the FBI that he had been arrested, and knew from Enriquez' prior trial that Eggleton was the other gunman who had invaded her home. In determining whether an identification procedure was improper, the court must look at the totality of the circumstances in each case. *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967).

The FBI did not inform Mrs. Smith that Eggleton would be in the lineup. Rather, she assumed he would be among the five men before her. Eggleton maintains that to eliminate the potential for undue suggestion Mrs. Smith could have been told that the suspect may or may not be in the

lineup, or the FBI could have run two lineups, one of which did not contain the suspect. However, under the totality of the circumstances, we do not believe that Mrs. Smith's identification of Eggleton was the product of any undue suggestion.

From Enriquez' prior trial Mrs. Smith obviously knew that the evidence showed that Eggleton was one of the persons who had entered her home. Nor would it have been unreasonable for her to assume that the suspect would be in the lineup. She testified that "I was told to see if I could identify anyone." We do not believe that there was any potential for undue suggestion in the manner in which the lineup was handled.

Even assuming that the pretrial confrontation was found to be unduly suggestive, it would not necessarily follow that identification testimony would have to be excluded at trial. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). If there is evidence from which the court can conclude that identification was reliable in spite of any undue suggestion, then the identification testimony would nevertheless be admissible. *Id.*

In *Manson v. Brathwaite,* 432 U.S. 99, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court stated that "reliability is the lynch pin in determining the admissibility of identification testimony * * *." *Id.* 432 U.S. at 114, 97 S.Ct. at 2243. The Court adopted the five-part "totality of the circumstances" test set out in *Neal v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). The factors to be weighed in assessing reliability include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2243.

Applying the *Manson* analysis to the facts of this case, we first note that Mrs. Smith had an opportunity to view the face of the man she believed to be Eggleton from the time he began struggling with her husband until the lights were turned off in the house, a period of some ten to fifteen minutes. While appellant asserts that Mrs. Smith could not have viewed the gunman for that length of time, it is apparent on this record that even if it were a short time, it was long enough for her to make a positive identification. The degree of attention paid by Mrs. Smith is evident from her ability to describe in great detail the events that occurred in her home and particularly to describe in some detail the woman who had knocked at her door, Carol Martin, whom she had seen only briefly. She described the gunman she later identified as Eggleton as the taller of the two that entered the house. When his ski mask was pulled back around his face, she could see his eyes, the bridge of his nose, his cheekbones and mouth area. Eggleton makes much of the fact that Mrs. Smith described the gunman as being clean-shaven when in fact at the time of the robbery Eggleton had a full beard and mustache. Counsel for the defendant extensively cross-examined Mrs. Smith about this omission. Mrs. Smith remained confident in her identification, stating that there was no doubt in her mind that the man she identified in the lineup and in court was one of the two men who had invaded her home. Finally, there is no doubt that the length of time between the crime and the lineup was substantial—one year and five months. However, it is apparent that Mrs. Smith's recollection of these events was particularly vivid and there can be no doubt from her testimony that the incident had been burned into her memory indelibly.

We do not believe that under the totality of the circumstances in this case that there is "a very substantial likelihood of irreparable misidentification." *Id.* 432 U.S. at 116, 97 S.Ct. at 2243. As the Court stated in *Manson* :

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Id.* So too, in this case we are convinced that it was proper for the jury to determine the appropriate weight to place on her identification testimony. Nor are we convinced that any unreliability in the identification is of constitutional dimension so as to have required exclusion of the testimony. In the final analysis, any apparent defect in the identification would go to the weight and not to the admissibility of the evidence.

## V. THE FORTY–FIVE YEAR PRISON SENTENCE.

▉ The appellant claims that the forty-five year sentence imposed violates his Eighth Amendment right against cruel and unusual punishment. In *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Court established a three-step analysis for reviewing whether a sentence violated the Eighth Amendment. This analysis consists of: (1) a comparison of the gravity of the offense and the harshness of the penalty; (2) a comparison of the sentences imposed for the same or similar offenses; and (3) a comparison of the sentences imposed for the same or similar offenses in other jurisdictions. Based on this record we cannot say that the district court exceeded its discretion in imposing the forty-five year sentence on Eggleton.

In this case there can be little doubt of the gravity of the offense with which Eggleton is charged. The robbers broke into the Smith home and held the entire family hostage through the night, threatening to kill them if they did not cooperate in the robbery. As a result of being held hostage, the wife of the bank official and his two children became so emotionally distraught that they were having psychological problems at the time of the trial. In addition, the controlling statute, 18 U.S.C. § 2113(e), states that one who is found guilty of bank robbery and kidnapping "shall be imprisoned not less than ten years, or punished by death if the verdict shall so direct." The sentence was therefore well within the statutory limits. We therefore cannot say that the gravity of the offense is out of proportion to the harshness of the penalty.

With regard to sentences imposed in the same jurisdiction, Eggleton first points to his co-conspirators. Michael Wright received a sentence of five years. Carol Martin received immunity. He fails to mention that Enriquez, although acquitted of this robbery, is presently serving a 50–year sentence in another similar robbery. In addition, it is not necessary that co-defendants receive the same sentences. *See United States v. McMahan,* 744 F.2d 647, 652 (8th Cir.1984). Factors which may alter the sentences imposed include cooperation with the government, *Roberts v. United States,* 445 U.S. 552, 557, 100 S.Ct. 1358, 1362, 63 L.Ed.2d 622 (1980), pleading guilty to a lesser charge, and the defendant's role in planning and organizing the crime. It is apparent that these factors may well explain the disparities in his co-defendants' sentences.

Eggleton also attempts in Appendix F to point out sentences imposed for other bank robberies in the Eastern District of Missouri. Of these, only two cases involved convictions under 18 U.S.C. § 2113(e)—Larry Wilson's sentence for 15 years and Henry Frank Enriquez' sentence for 50 years. We, therefore, cannot conclude that the trial court's imposition of a 45–year sentence was grossly disproportionate with other sentences imposed in the same jurisdiction.

In Appendix E of the appellant's brief, appellant includes a list of sentences imposed for certain offenses throughout the United States. Comparing the sentences in other jurisdictions imposed for violation of 18 U.S.C. § 2113(e) in which no murder was committed, we conclude that the forty-five year sentence in this case is not excessive. In 1979 one defendant received a sentence of 17 years, two others received sentences of 40 years, and another received a sentence of 45 years. In 1980, two defendants received sentences of 30 years. In 1981, one defendant received a sentence of four years, another received a sentence of 20 years, and another received a sentence of 45 years. In 1982, one defendant received a sentence of 10 years, another received a sentence of 15 years, another of 16 years,

another of 20 years, and another of 50 years. In light of the fact that during 1979–1982 a number of defendants received sentences at or near the 45–year sentence imposed in this case, we cannot conclude that the sentence imposed by the district court was grossly unfair. Therefore, the district court did not abuse its discretion in sentencing Eggleton to 45 years.

For all of the foregoing reasons, we affirm the decision of the district court.