# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3828

_____

| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| William Boone, | * |
| | * |
| Appellant. | * |
| | * |
| | * |

_____

No. 04-3829

_____

United States of America,

Appellee,

v.

Kelvin Washington,

Appellant.

Appeals from the United States
District Court for the Western
District of Missouri.

| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| | * |

_____

No. 04-3831
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Jerome Creighton, | * |
| | * |
| Appellant. | * |
| | * |
| _____ | * |
| | |
| No. 04-3836 | |
| _____ | |
| | * |
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Barbara Turner, | * |
| | * |
| Appellant. | * |

_____

Submitted: November 17, 2005
Filed: February 15, 2006 (Corrected: 3/02/06)
_____

-2-

Before MURPHY, BOWMAN, and GRUENDER, Circuit Judges.

_____

MURPHY, Circuit Judge.

William Boone, Jerome Creighton, Barbara Turner, and Kelvin Washington were each convicted of felony murder, armed robbery, use of a firearm during a crime of violence, and conspiracy to commit an offense against the United States. Turner was also convicted of attempting to murder two law enforcement agents while they were transporting her to a federal correctional institution. The district court[1] sentenced each of the four defendants to two consecutive life terms in prison. They now appeal their convictions, raising numerous issues. We affirm.

I.

The armed robbery and felony murder of which all the defendants were convicted took place at the Davis Club, a recreational club for enlisted personnel at Fort Leonard Wood near Kansas City, Missouri. On the night of December 13, 2001 two masked men, one of whom was carrying a shotgun, entered the club through an unlocked door. The robbers surprised Connie Oeffler, a club employee who was preparing to close up for the evening, and her friend Brian Adams who was keeping her company as she finished work. The intruders bound the hands of Oeffler and Adams with cable ties, forced them to lie down on the floor, and started to stuff the contents of the club vault into a black bag. One of the intruders took Adams into an adjoining room, and Oeffler testified that the second robber ran into that room after she heard a scuffle and furniture being overturned. Oeffler then heard two shots. Adams was subsequently found dead from gunshot wounds.

_____

[1]The Honorable Dean Whipple, Chief United States District Judge for the Western District of Missouri.

-3-

Shortly after Adams was shot, Cassandra Leone and Kathy Warden arrived to deposit into the Davis Club vault the nightly proceeds from another recreational club on the base. This was something they did every night as part of their jobs but they had arrived later than usual that evening because a failed health inspection at their own club had forced them to stay late and clean. When Oeffler told them that a robbery was in progress, the two women attempted to barricade themselves in the vault, but they were eventually apprehended by the robbers who wanted to know if they had pushed "the button." That was a reference to the trigger for the vault's silent alarm system, which neither the women with the deposits nor Oeffler knew about at the time. The robbers subsequently herded Leone and Warden into the men's restroom at gunpoint, where they were held until the robbery was completed. Shortly thereafter a third man appeared without a mask; the government argued at trial that he had been acting as a lookout. The three men eventually departed the club with over $50,000 in cash and coins. Their take was approximately $14,000 more than the amount the club would normally have had on hand because it included the jackpot for a "Super Bingo" event scheduled for later that week.

As soon as the robbers were gone, the three women victims called the military police who undertook an investigation in conjunction with the FBI which continued over the next year. Because a door to the club had been left unlocked and the robbers apparently knew about the vault's security system, the regular schedules of employees who might have been present, and the vault contents on the night of December 13, investigators suspected that the robbery was an inside job. Over the subsequent months they used eye witness accounts from Oeffler, Leone, and Warden along with a variety of other evidence to identify the four appellants, two of whom worked at the Davis Club, as the perpetrators.

There was evidence that club manager Barbara Turner, along with her friend William Boone who frequently resided with her, had done most of the planning. They developed the idea of robbing the club and recruited Jerome Creighton and Kelvin

Washington for the undertaking. They also made necessary preparations, such as purchasing cable ties and walkie talkies from a Wal-Mart in St. Robert, Missouri (they were shown leaving the store on a December 9 videotape). In addition Turner used her computer to make fake military identification badges for Boone and Creighton (whose pictures were found on her hard drive). She also deposited the Super Bingo jackpot in the club vault several days before it would be needed. Turner would have known about the vault's silent alarm system and have been able to predict when the club would have the fewest people inside. Her friend Melissa Winslow testified at trial that in a conversation after the crime, Turner had admitted her involvement and implicated the other defendants. Leone and Warden testified that Turner told them on December 14 that they "were not supposed to be there" when the robbery took place. Turner testified at trial and denied all involvement.

The government alleged that the shotgun used in the robbery had been purchased by Boone from an acquaintance named Jerome Shelton who testified at trial. The government also sought to prove that Boone participated in the actual robbery as one of the masked assailants. Boone did not testify in his own defense but he did offer an alibi to investigators. According to him, he was watching movies with Lani Dvorak at a motel several miles from the base at the time the robbery was committed. Dvorak initially corroborated his story before the grand jury, but later disavowed that testimony. At trial she reported that she had not seen Boone for several weeks until late in the evening of December 13 when he appeared in her motel room without his glasses, claiming to have lost them in a fight (the government argued at trial that they had been knocked off his head during the scuffle with Adams). Dvorak also testified that she spent time with Boone the next day and saw him in possession of large quantities of currency and rolled quarters and that he asked her to dispose of a black duffel bag, to which she was later able to lead investigators. Shortly after the robbery Boone opened a Bank of America checking account with $1700 in cash.

Boone and Turner were both arrested in December 2002. While Turner was being transported to a federal correctional institution in Springfield by FBI agent Christopher Holland and sheriff's deputy Brad Ford, she lunged over the front seat of the car, grabbed the steering wheel, and steered the vehicle into a tractor trailer truck. The car crashed under the trailer which continued down the road a way, and Turner began kicking Holland. She later told Holland and Ford that she had been trying to kill herself. This incident was the basis for the attempted murder charge of which Turner was convicted.

According to the government's theory of the case, Washington, a soldier working at the Davis Club part time, was the second masked robber who actually held the shotgun during the robbery. Washington and Turner were romantically involved, and he appears on the December 9 Wal-Mart videotape. Oeffler told investigators that she recognized Washington's voice during the robbery when he said, "Ooh, we had a pretty good night, didn't we?". She explained that because she had been "scared for my life" she initially said only that the voice reminded her of Washington. Although Washington did not testify at trial, he implicated the other defendants in a statement to investigators and admitted to knowing about their plans. He insisted that his only involvement had been to leave the door of the club unlocked at the end of his shift at Turner's request and to tell Boone by walkie talkie how many people were left in the club that night. He was arrested in New York City in March 2003 while carrying a fake driver license under the name Roman Hodges. He attempted to flee but was apprehended by local FBI agents.

There was evidence that Creighton, a friend of Turner and Boone, was the third robber, the one who appeared without a mask and who may have acted as a lookout. Creighton's photo was found on Turner's computer, and a sketch of the third robber made from Oeffler's description resembled his likeness and included a distinctive facial scar, even though she placed it on the wrong side and described his earrings as studs instead of hoops and him as Hispanic instead of African American. Inside the

car of Creighton's girlfriend, which she testified he borrowed the night of the robbery, investigators discovered unused cable ties of the same type used to bind Oeffler and Adams. Shortly after the robbery Creighton left the Kansas City area for several months. He spent some of that time with a friend in Elkton, Kentucky, who testified that Creighton had had rolls of cash in a backpack which he used to pay for his hotel and cover charges at various night clubs. Creighton, who did not testify at trial, denied any involvement in the case.

All four defendants were eventually indicted for felony murder under 18 U.S.C. § 1111, armed robbery under 18 U.S.C. § 2111, use of a firearm during a crime of violence under 18 U.S.C. § 924, and conspiracy to commit an offense against the United States under 18 U.S.C. § 371. Turner was also charged with the attempted murder of Holland and Ford under 18 U.S.C. § 1114.

A key development at trial occurred after the prosecution had rested. Counsel for Boone sought to have Lani Dvorak declared unavailable and portions of her grand jury testimony admitted into evidence to support his alibi. The court told the government to try to locate her over the weekend because of possible confrontation issues. When she was found in Colorado by the United States Marshals Service, she indicated that she wanted to recant her grand jury testimony. On Monday the government moved to reopen its case in chief so it could call Dvorak as a witness. It asserted that her decision to recant had taken it completely by surprise, and the district court granted the motion to reopen over the objections of Turner, Boone, and Creighton. Although counsel for the defendants were allowed to interview Dvorak before she testified, she terminated the meeting shortly after it commenced. The defendants did not move for a continuance in light of the new development, however, and they had the opportunity to cross examine Dvorak.

Appellants also objected to various other decisions by the district court, including the denial of severance motions by Boone and Creighton, motions for

acquittal by Creighton and Washington, Turner's motion for a mistrial and dismissal of the attempted murder count, and Washington's pro se motion for new counsel for sentencing. Counsel for Turner also recorded an objection to the court's permitting case agent Holland to escort witnesses in the courtroom. All four defendants were eventually convicted and sentenced to two consecutive life terms in prison. These appeals followed.

## II.

Appellants raise a number of issues. Boone attacks the district court's denial of his motion to sever and its decision to allow the prosecution to reopen its case in chief. Creighton challenges the denial of his severance motion as well as the sufficiency of the evidence. Washington claims that the evidence was insufficient, that his due process rights were violated by the government's refusal to believe his version of the crime, and that the district court erred by denying his motion for new counsel and by admitting evidence of his flight during arrest. Turner challenges the district court's decisions to allow the prosecution to reopen its case and to permit case agent Holland to escort witnesses into the courtroom during trial, alleges prosecutorial misconduct during closing argument, and claims that her indictment for attempted murder should have been dismissed because of outrageous conduct by agent Holland.

## A.

Boone and Turner contend that the district court abused its discretion when it allowed the government to reopen its case in chief to permit Dvorak to testify. They assert that their counsel were taken by surprise and were given no opportunity to question Dvorak in a meaningful fashion before she testified. Since each of their defense theories relied on the premise that Dvorak's grand jury testimony had been truthful, they claim their counsel lost all credibility before the jury when she recanted. The government counters that the district court decision was consistent with our

precedents. It also notes that Dvorak's testimony came directly after the government had originally rested and before any defense witness testified, thereby minimizing any prejudice to appellants resulting from the order of the evidence.

A trial court may permit either side to reopen its case in chief, see United States v. Blum, 65 F.3d 1436, 1444 (8th Circuit 1995), and we have previously characterized the discretion it exercises in doing so as "wide." United States v. Vanhorn, 296 F.3d 713, 719 (8th Cir. 2002). Where the government has been allowed to reopen, the factors to be considered in reviewing that decision include whether the new evidence caused surprise to the defendant, whether the defendant was given adequate opportunity to rebut the new evidence, and whether the evidence was more detrimental to the defendant than it otherwise might have been because of the order in which it was presented. United States v. Rouse, 111 F.3d 561, 573 (8th Cir. 1997) (internal quotations omitted).

Dvorak's testimony was highly probative and came directly after the government had rested, so the "orderly flow" of the evidence was not disrupted. United States v. Larson, 596 F.2d 759, 779 (8th Cir. 1979). It is significant that defendants were not denied an opportunity to cross examine her. While her change of heart may have surprised defense counsel and undermined their planned defense strategy, they failed to request a continuance. See, e.g., United States v. McQuisten, 795 F.2d 858, 864 (9th Cir. 1986) (reopening was not abuse of discretion where defendant failed to request a continuance so that witness could be cross examined). On this record we see no abuse of discretion by the trial judge.

B.

Boone and Creighton argue that the trial court abused its discretion when it denied their motions to sever. Both claim to have been prejudiced by incriminating statements made by Turner and Washington and by the inflammatory nature of

Turner's actions related to her attempted murder charge. Boone also notes that Turner "blurted out" on direct examination that he had spent time in prison, a fact that would otherwise have been inadmissible. Creighton argues that the joint trial obscured the fact that he took no part in planning the robbery and was tied to very little of the physical evidence. Creighton also complains that Turner's testimony that she had not seen him on the night of December 13 conflicted with his theory of defense based in part on what his former girlfriend Diane Echols said about his whereabouts that night. The government responds that neither Boone nor Creighton has made a sufficient showing to counter the strong preference for trying codefendants together.

Fed. R. Crim. P. 14(a) entrusts the decision of whether codefendants should be severed to the "sound discretion of the trial judge." United States v. Knife, 592 F.2d 472, 480 (8th Cir. 1980). Where multiple defendants are charged in the same indictment, there is a preference for a joint trial unless the party moving to sever can show that the benefits are outweighed by a clear likelihood of prejudice. Zafiro v. United States, 506 U.S. 534, 537 (1993); United States v. Frazier, 280 F.3d 835, 844 (8th Cir. 2002). Such a likelihood may be demonstrated by showing either that the jury cannot be expected to compartmentalize the evidence with respect to different defendants due to a "prejudicial spillover effect" between the cases against them, United States v. Lueth, 807 F.2d 719, 731 (8th Cir. 1986), or that one defendant's defense conflicts with that of another and that the jury is likely to infer from this conflict alone that both are guilty. United States v. Ortiz, 315 F.3d 873, 898 (8th Cir. 2002). Merely showing that a separate trial would increase the likelihood of acquittal is not sufficient. United States v. Gravatt, 280 F.3d 1189, 1191 (8th Cir. 2002).

We conclude that a severance was not warranted for either Boone or Creighton. The incriminating statements made by Washington and Turner were redacted for trial to exclude references to the other defendants and so avoid any Bruton problem.[2]

_____

[2] In Bruton v. United States, 391 U.S. 123, 135-36 (1968), the Supreme Court held that admission of incriminating out of court statements by one defendant which

-10-

Turner's reference to Boone's time in prison was made in passing; at best the failure to exclude it was harmless error given the weight of the other evidence. See United States v. Carroll, 207 F.3d 465, 470 (8th Cir. 2000). As for the contradiction between Turner's testimony and that given by Echols (who was the government's witness, not Creighton's), Creighton has not argued that it led the jury to infer that both defendants were guilty. See Ortiz, 315 F.3d at 898. None of these specific claims are sufficient to overcome the preference for a joint trial. See Frazier, 280 F.3d at 844. Finally, the general assertion of prejudice by Boone and Creighton because of evidence that did not apply to them was insufficient on its face to warrant severance. See United States v. Pecina, 956 F.2d 186, 188 (8th Cir. 1992) ("disparity in the weight of the evidence" does not require severance). Where multiple defendants are tried together, the risk of undue prejudice is best cured through cautionary instructions to the jury, United States v. Mickelson, 378 F.3d 810, 817 (8th Cir. 2004), which the district court gave in this case. We conclude there was no abuse of discretion.

C.

Creighton and Washington maintain that the evidence was insufficient to convict them. Creighton argues that there was virtually no physical evidence such as surveillance footage or large amounts of cash linking him to the crime and that his conviction should be overturned because it was based almost entirely on Oeffler's eye witness identification which he characterizes as ambiguous. The government counters that Oeffler's identification was not ambiguous. She observed a light skinned person of color who had a scar on his face and was wearing earrings. It also points to the sketch produced from her recollections which it says closely matches Creighton's likeness. Oeffler was also able to repeat her identification of Creighton at trial, and it was corroborated by circumstantial evidence.

---

implicate a codefendant violate the latter's confrontation clause rights.

For his part Washington admits to having left the door of the Davis Club open and to having contacted Boone to tell him how many people were left in the club. He claims, however, that the only evidence to support the government's theory about his role was Oeffler's identification of his voice, which he asserts was an inadequate basis for conviction. The government counters that the credibility of Oeffler's identification was for the jury to decide, and that its finding is "virtually unreviewable" on appeal.

We review the evidence underlying a conviction de novo, but will uphold the verdict if it is supported by substantial evidence. United States v. Fitz, 317 F.3d 878, 881 (8th Cir. 2003). The motion for acquittal was properly denied if a reasonable jury could have found the defendant guilty beyond a reasonable doubt despite any countervailing testimony. United States v. Cruz, 285 F.3d 692, 697 (8th Cir. 2002); see also United States v. Armstrong, 16 F.3d 289, 292 (8th Cir. 1994). In light of the verdict all evidentiary ambiguities and discrepancies are resolved in favor of the government. United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003).

Both Creighton and Washington dispute evidence on which the jury apparently relied, particularly Oeffler's eye witness identification of each of them. They assert instead their own accounts of the evidence, but factual questions are the province of the jury and its determinations normally control. See United States v. Pardue, 983 F.2d 843, 847 (8th Cir. 1993). In this case it was not unreasonable for the jury to rely on Oeffler's identification of both men. The sketch of the unmasked robber produced from her recollection resembled Creighton, and the jury could consider any factual mistakes in her description as well. Moreover, her identification was corroborated by circumstantial evidence like the existence of Creighton's image on Turner's computer. Washington and Oeffler had spent significant time together as coworkers, and she told the jury she had no doubt that the voice she heard on the night of December 13 was his. Washington had the opportunity to cross examine her about her identification of him, and the jury apparently believed that fear for her life was the reason she had initially said only that the voice she heard reminded her of Washington. Moreover,

Washington admitted to being complicit in the crime. Taking the evidence in a light most favorable to the government, we conclude that a reasonable jury could have found both Creighton and Washington guilty beyond a reasonable doubt.

D.

Washington also argues that the district court erred by denying his pro se motion for new counsel for sentencing and by admitting evidence of his flight during arrest, and charges that his due process rights were violated.

Washington contends that he was entitled to new counsel for sentencing. He claims his trial attorney made a number of serious mistakes that could have prejudiced him, including advising him not to testify at trial and failing to object to the presentence investigation report, to present evidence at sentencing, or to move for a new trial. He also claims that trial counsel told him that he would not be able to lend his full ability to the case because of "personal problems." The government responds that counsel was an experienced federal criminal trial attorney whose strategic choices were similar to those made by the attorneys for the other defendants and that Washington had effective representation even though he might be dissatisfied with it.

The Sixth Amendment entitles criminal defendants to effective assistance of counsel which means "the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." Nerison v. Solem, 715 F.2d 415, 417 (8th Cir. 1983). We review denial of a request for new counsel for abuse of discretion. United States v. Barrow, 287 F.3d 733, 737 (8th Cir. 2002). In order for such a request to be successful, the defendant must show justifiable dissatisfaction with his current representation. Id. Justifiable dissatisfaction can arise from irreconcilable conflict, a complete breakdown in communication, or any other factor interfering significantly with an attorney's ability to provide zealous representation,

-13-

but it is not established merely by a defendant's frustration with counsel's performance or disagreement with his tactical decisions. Id. at 738.

Washington has shown only that he was not happy with some of counsel's tactical choices and his reservation about giving the case his full "100 percent." Washington has not demonstrated that he was prejudiced by any of the decisions about which he complains which were similar to those of counsel for the other defendants. In order to represent his client well at a federal sentencing hearing, it is important for defense counsel to have a thorough knowledge of the record and the trial evidence. See United States v. Swinney, 970 F.2d 494, 499 (8th Cir. 1992) ("(T)he district court must balance the defendant's right to counsel of his choice and the public's interest in prompt and efficient administration of justice.") (internal quotations omitted). We conclude the district court did not abuse its discretion in denying Washington's request for new counsel for sentencing.

Washington next argues that admitting evidence of his flight at the time of his arrest was reversible error. He concedes he failed to raise this issue before the trial court but maintains that admission of the evidence was plainly erroneous because the flight occurred fifteen months after his offense, it had no probative value other than showing consciousness of guilt, and the district court failed to give a cautionary instruction. The government counters that there was no plain error affecting Washington's substantial rights.

Flight of an accused subsequent to commission of a crime is properly admitted to show consciousness of guilt where other facts suggest that his decision to flee was related to that offense. United States v. Blue Thunder, 604 F.2d 550, 556 (8th Cir. 1979) (internal quotations omitted). Although courts should be cautious in admitting evidence of flight and it may not always be reliable, United States v. Melson, 7 F.3d 750, 752 (8th Cir. 1996), the potential for undue prejudice can be lessened by a cautionary instruction to the jury. United States v. Peltier, 585 F.2d 314, 324 (8th Cir.

1978).  Since this issue was raised for the first time on appeal, we review solely for plain error.  Carroll, 207 F.3d at 470.

Plain error occurs where there is an error which is plain and affects the defendant's substantial rights.  United States v. Hill, 91 F.3d 1064, 1072 (8th Cir. 1996).  Evidence of a defendant's flight is admissible even if offered only to prove consciousness of guilt where it appears in conjunction with other proof such as evidence that the defendant was living under an assumed identity.  See  United States v. Eggleton, 799 F.2d 378, 381 (8th Cir. 1986).  The evidence here included proof that Washington was carrying false identification.  Furthermore, the elapsed time between Washington's offense and his flight was less than in some other cases in which we upheld the admission of such evidence.  See, e.g., id. at 380-81 (flight twenty months after crime committed).  While the district court did not give a limiting instruction, none was requested and under such circumstances the omission of a cautionary instruction is not plain error.  See United States v. Hankins, 931 F.2d 1256, 1263 (8th Cir. 1991) ("the decision whether to instruct the jury on flight is best left to the district court").  Finally, the evidence was referred to in the government's argument only in passing.  We conclude that there was no plain error in admitting the evidence because it did not affect Washington's substantial rights.  See United States v. Haukaas, 172 F.3d 542, 544-45 (8th Cir. 1999).

Washington finally argues that the government's refusal to believe his own account of his participation in the crime instead of Oeffler's testimony was prosecutorial misconduct in violation of his due process rights.  The government states that it was entitled to disbelieve his account in light of Oeffler's testimony and in light of what Turner told her friend Melissa Winslow about Washington's role even though those statements were not introduced at trial.

For governmental reliance on eye witness testimony to rise to the level of misconduct which violates due process, the testimony must have been perjured, the

-15-

government must have known it was, and there must have been a reasonable likelihood that the perjured testimony affected the jury's factual determinations. United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995) (internal quotations omitted). Here, Washington has not established or even claimed that Oeffler perjured herself in identifying him. We conclude that there was no prosecutorial misconduct in violation of his due process rights.

E.

Turner contends that she was entitled to a mistrial because of prosecutorial misconduct during its closing arguments and to dismissal of the attempted murder charge of which she was convicted because of outrageous conduct by the officers transporting her to Springfield. She also claims prejudice from case agent Holland's escorting witnesses into the courtroom.

Turner argues that the district court erred in denying her motion for a mistrial. She claims that in its closing argument the government "shifted the burden of proof" and mischaracterized statements of her own counsel about the evidence against Boone, thereby making her appear untrustworthy and in league with another defendant. The government notes in response that during and after closing arguments the trial judge instructed the jury as to who had the burden of proof and that the prosecutor only made reference to the same principles. While the prosecutor may have mistakenly stated that Dvorak rather than defense counsel had been the first to reveal the fact that Boone lost his glasses on the night of the robbery, he also reminded the jurors that any statement made during closing arguments was not evidence and that they should trust their own recollections of the evidence.

Prosecutorial remarks during closing argument can be grounds for reversing a defendant's conviction if they were improper and prejudicially affected the defendant's substantial rights so as to deprive her of a fair trial. United States v. Beckman, 222

F.3d 512, 526 (8th Cir. 2000). Here we have found no place in the prosecution's closing argument shifting the burden of proof. We also conclude that the prosecutor's mistaken attribution of the revelation about Boone losing his glasses could not have prejudicially affected Turner's substantial rights given the other evidence against her. Turner's motion for a mistrial was properly denied.

Turner next contends that the charge of attempted murder against her should have been dismissed because of outrageous conduct by FBI agent Holland which violated her due process rights. She alleges that throughout his investigation Holland threatened and intimidated her, engaged in other inappropriate conduct, and verbally abused her using racial slurs during the drive to Springfield. Although the jury convicted her of attempted murder, she points out that it could have found that Holland provoked her as she claims because the instructions on the elements of the offense included acting "in the heat of passion." In response the government notes that both Holland and Ford denied Turner's allegations, that Turner herself has made contradictory statements about what took place during the drive to Springfield (in her pretrial motion to dismiss she denied that she ever grabbed the steering wheel of the vehicle), and that even if Turner's allegations were true, Holland's actions would not have been sufficiently conscience shocking to violate her due process rights.

Outrageous government conduct that shocks the conscience can require dismissal of a criminal charge, but only if it falls within the "narrow band" of the "most intolerable government conduct." Pardue, 983 F.2d 843, 847 (internal quotations omitted). Whether particular government conduct was sufficiently outrageous to meet this standard is a question of law which we review de novo. Id.; United States v. King, 351 F.3d 859, 867 (8th Cir. 2003). Turner's motion to dismiss was properly denied because her allegations were not credible. Her own account of what took place on the way to Springfield has changed over time. Moreover, the rule that outrageous government conduct can foreclose criminal charges has been applied by our court almost exclusively to situations involving entrapment, where law

enforcement officers have sought to create crimes in order to lure a defendant into illegal activity that "she was not otherwise ready and willing to commit." United States v. Lard, 734 F.2d 1290, 1297 (8th Cir. 1984). Turner has not even alleged that any government official engaged in such conduct here, and we conclude that she has not shown any due process bar to her attempted murder conviction.

Turner finally argues that the district court abused its discretion in allowing case agent Holland to escort witnesses, claiming that his activities prejudiced the defendants by creating the impression that the witnesses needed to be protected from danger. The government counters that Turner has offered no support for this claim. We review a district court's conduct of the trial for abuse of discretion, United States v. Woody, 588 F.2d 1212, 1213 (8th Cir. 1979), and will not reverse absent a showing of actual prejudice. United States v. Sykes, 977 F.2d 1242, 1245 (8th Cir. 1992). Turner's assertion of prejudice here is only speculative, and we conclude that she has shown no abuse of discretion in the way in which the court managed the trial proceedings.

III.

For these reasons we affirm the judgments of the district court.

_____